COMMONWEALTH *vs.* JAMES E. CONNORS.

Norfolk.    October 1, 1962. — November 6, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
& SPIEGEL, JJ.

*Breaking and Entering.    Evidence,* Consciousness of guilt.

A finding in a criminal case that it was the defendant who had broken and
entered a building one Saturday evening was warranted on circumstan-
tial evidence, including evidence that an automobile found near the scene
of the crime at the time of its commission, with clothing in it admittedly
the defendant's, had been hired for the weekend by him, although he
had an automobile of his own, and evidence of his making inconsistent
statements, claiming an alibi later admitted to be false, and delaying
many hours in meeting the police after learning that they were looking
for him.

INDICTMENT found and returned on June 9, 1961.

The case was tried in the Superior Court before *DeSaul-
nier,* J.

*Arnold E. Kahn* for the defendant.

*Walter E. Palmer,* Assistant District Attorney, for the
Commonwealth.

WHITTEMORE, J.    The defendant contends that the evi-
dence on which he was found guilty of the charge that on
February 18, 1961, "in the night time [he] did break and
enter . . . [the building at 32 Freemont Street, Needham,
occupied by the Seven-up Bottling Company] with intent
therein to commit larceny," was insufficient to take the case
to the jury.    We disagree.

There was evidence, including admissions of the defend-
ant in statements to police officers, of these facts: At about
9 P.M. the building was secure and no automobile was
parked in front of the Lawson's Express Company build-
ing on Wexford Street about 100 yards away.    At about
9:42 P.M. an A. D. T. alarm brought two police officers to
the site where, in the prevailing fog, they saw and pursued

but failed to catch two men who were about forty or fifty feet or more from the officers and running away from the building. The police found a window jimmied, an interior wall broken, furnishings disturbed, and a safe jimmied. They also found a Ford automobile parked by the front door of the Lawson building.

In the neighborhood are business houses and warehouses; there are only two dwelling houses in the whole area. None of the business houses was open for business.

The automobile found by the police had been hired by the defendant from General Rental Co. on the afternoon of February 17, under a weekend special contract. The contract for hire recited "Only drive between 5 A.M.–8 P.M." On the rear seat of the rented automobile were found a top coat, two hats, a pair of slacks, and a sweater. The defendant, who was traced through the rental company records, in his first statement to the police admitted that these articles were his and said he intended to take them to the cleaners.

The defendant also owned a Ford automobile which he customarily parked in the parking space of the Newtonville Gulf filling station on Washington Street, Newtonville. So far as known to Victor M. Martino, the owner or operator of the station, the defendant did not "have his car on the day of February 18th, 1961," nor "have any kind of an automobile at . . . [the] place."

On the morning of February 18, 1961, the defendant, with Roy King, went to the home in Dorchester of Owen Larkin, who then met the defendant for the first time. The defendant left after about a half hour without King. Larkin and his wife were at home on the evening of February 18. The defendant next came to Larkin's house about 2 A.M. on Sunday, February 19, alone and wearing a top coat. He remained in the house for breakfast and until about 9:30 A.M. These facts were testified to by Larkin and in part by his wife. The defendant telephoned his mother about 9 A.M. and told her where he was. She told him the Newton police were looking for him and he told her to tell

the police that he would meet them at Newton Corner about 6 P.M. Another officer recalled that the defendant himself called the Newton police station and said he would see the police at 6 P.M.

According to the defendant's statements to the police, after leaving Larkin's house between 9 A.M. and 11 A.M. the defendant went by M. T. A. to Brighton, arriving there about 1 P.M., and went to a bar. He stayed there drinking whiskey sours until about 6 P.M. and then took a cab to Newton Corner where he was picked up by the Newton police and taken to the Newton station. Although he said he had been drinking, the defendant appeared perfectly sober. He told the officers he had been unemployed since November. So far as the car being in Needham it must, he said, have been stolen. One officer recalled that the defendant, when asked what his car was doing on Wexford Street on February 18, replied that his car had been stolen but he had not reported it.

The defendant was then taken to the Needham police station and made this statement in substance: On the afternoon of February 17 he rode around in the rented car, part of the time with a girl and also with Robert Davis, a friend, and, after eating with Davis, going to the defendant's home at 147 Lowell Avenue, Newtonville, and driving Davis to Boston, the defendant drove back to Newtonville and parked the car in the Gulf gasoline station at Lowell Avenue and Washington Street. He did not want to drive after 7 P.M. as he had a restricted license. He went by bus and M. T. A. to "a friend's house in West Roxbury whom he identified as Owen Larkin," and spent the evening playing cards and watching television. He left there Saturday morning between 11 A.M. and 1 P.M., retrieved the hired car at the Gulf station, drove to various named places and for various stated purposes until about 7:15 P.M., when he again parked the car in the Gulf station. He took the bus and the M. T. A. and arrived at Larkin's home at about 8:30 P.M. where he spent the evening, and went to bed, getting up about 9 A.M.

After the police had interviewed the Larkins they spoke again with the defendant, on February 22, telling him that his alibi would not stand up.  He then admitted that he was not at Larkin's house as he had stated, but said he had been out with a married woman.  When the officer expressed disbelief at this ''oldest alibi in the book,'' the defendant said it did not make any difference because ''he was out with her after ten o'clock. . . .  [The officer] then questioned him as to his whereabouts at the time of the break and he told . . . [the officer] that at that time he had no alibi.''  Larkin was then present and the defendant said to Larkin that ''he wasn't at his house during this time.''

A female witness testified that she lived in Quincy with her husband and child, had a tiff with her husband on February 18, 1961, left home about 6:30 P.M., went to the Pizza King at Washington and Boylston streets for a cup of coffee, within a short time saw the defendant come in, was with him there for a half hour, and then went with him across the street to Jerome's place where they remained until it closed at midnight when she took a cab and went home.  The meeting was a coincidence.  She had known the defendant since 1955, and had been friendly with the defendant and with his family over the years.

Reasonable inferences support the conclusion that whoever committed the crime came in the rented automobile to the robbery scene.  See *Commonwealth* v. *Conroy,* 333 Mass. 751, 754–755.  The defendant's exclusive right to possession of the car and, presumably, his possession of the usual means of operating it, as well as his admitted inability to state his whereabouts at the time of the break, are some evidence that the defendant was in the car when it was parked near the entered building.  *Commonwealth* v. *Swartz,* 343 Mass. 709, 712.

His inconsistent statements, his admittedly false alibi, and his delay in meeting the police after learning they wished to see him were evidence of consciousness of guilt.  That, with other evidence, may be enough to prove guilt.  *Ibid.* pp. 712–713.  *Commonwealth* v. *Curry,* 341 Mass. 50,

55. The defendant did not explain why, owning a car, he hired another. The jury could ask why, if not hiding, he had gone to the house of a man he had met only the day before, rather than to his own house. The jury could infer that the delay in meeting the police was to rehearse or attempt to establish an alibi. It was reasonable to conclude that an innocent man would have hastened to the police station to clear himself. The jury, of course, were not obliged to believe the female witness. An alternative was to believe that, as the defendant himself said according to the police, he did not meet the married woman until after 10 P.M.

There is nothing in the contention that there was error in the denial of the motion for a new trial.

*Judgment affirmed.*