COMMONWEALTH *vs.* RALPH E. ROGERS.

Suffolk.    November 7, 1966. — January 4, 1967.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Evidence,* Admissions and confessions, Photograph, Relevancy and materiality, View. *Constitutional Law,* Admissions and confessions, Assistance of counsel. *Federal Law. Law or Fact. Practice, Criminal,* Requests, rulings and instructions. *Homicide.*

Police testimony at two voir dire examinations by the trial judge in a murder case in the absence of the jury and later before the jury warranted conclusions, contrary to conclusions inferable from unsupported testimony of the defendant, that upon his arrest eleven days after the crime he was accorded the statutory privilege of using the telephone at the police station to which he was taken, that while there he was repeatedly advised of his constitutional rights, was afforded fair opportunity to get in touch with counsel, and was not induced to confess by

any improper methods, and that a confession he made there was voluntary and not unduly influenced by liquor consumed by him prior to his arrest. [528–529]

Whether evidence had been unlawfully obtained was a question of law for the court in a criminal case and need not be the subject of instructions to the jury. [530]

The trial judge in a criminal case followed the approved Massachusetts practice with respect to the question of the voluntary nature of statements made to police by the defendant. [530]

No violation of the principles set out in *Escobedo* v. *Illinois,* 378 U. S. 478, was shown with respect to the defendant in a criminal case in Massachusetts who was arrested and taken to a police station, was informed "that he didn't have to make any statements, and that he was entitled to counsel, and a telephone call, and that he could stand mute," was given a chance to call an attorney and spoke with the wife of a legislator and, upon failing to reach him, stated that there was nobody else he would like to call, and then made a confession to police without an attorney present. [530]

Under *Johnson* v. *New Jersey,* 384 U. S. 719, the Federal Constitution did not require the application of the principles set forth in *Miranda* v. *Arizona,* 384 U. S. 436, to a Massachusetts criminal case tried before the date of the *Miranda* decision, and this court declined to so apply such principles. [530–531]

At a trial for murder in the first degree of a woman whose hideously mutilated, nude corpse was found in a room rented by the defendant, there was no error in the admission of duly authenticated pictures of the corpse. [531]

The judge at a murder trial adequately instructed the jury as to drawing any inference of guilt from the defendant's "acts or words" after he left the scene of the homicide. [531]

At a trial for a murder committed in the defendant's room in a lodging house, testimony by the occupant of an adjacent room that close to the time of the homicide the defendant told him that he had been in "a fight" was properly admitted, even though the witness had been drinking prior to the conversation. [531]

At a trial for murder of a woman committed in the defendant's room in a lodging house, testimony of one who lived on the floor "right below" the defendant's room that he had heard "quite a rumpus" on the floor above him about the time of the homicide was properly admitted, although the witness conceded that in the circumstances it was "hard to tell" whether he recognized the voices and that he had some animosity toward the defendant. [531–532]

The charge at a murder trial, taken as a whole, did not place any improper burden of proof on the defendant with respect to his alibi testimony. [532]

Where the judge's instructions to the jury at the trial of a criminal case were correct and ample concerning the Commonwealth's burden of proof, he was not required to give instructions requested by the defendant that evidence as consistent with innocence as with guilt was insufficient to sustain a conviction. [532]

Even if the defendant in a murder case had been so drunk that his act of
killing the victim was not done with "deliberately premeditated malice
aforethought" within G. L. c. 265, § 1, evidence of the brutal nature of
the killing and of multiple and serious injuries sustained at that time
by the victim, a small woman, at least required a finding of malice afore-
thought, so that it was proper to instruct the jury that there was no
evidential basis for finding the defendant guilty only of manslaughter.
[532–533]

At the trial of an indictment for murdering a woman who was seriously
injured and mutilated, where there was medical testimony that no single
cause of death could be identified and that the mutilation was done about
the time of other injuries when the victim was "probably alive or in a
dying phase," there was no error in the denial of an instruction that, if
the jury found the victim died from strangulation, subsequent mutilation
of the corpse could not be considered on the issue of murder committed
with extreme atrocity or cruelty, or in the denial of instructions con-
cerning the defendant's motive for the murder. [533–534]

What is seen by a jury on a view in a criminal case may be used by them
in reaching a verdict. [534]

There was no error at a criminal trial, after a voir dire examination by the
judge in the absence of the jury, in permitting a police sergeant, who
had conducted an interrogation of the defendant culminating in a con-
fession, to use a police stenographer's transcript of the interrogation to
refresh the witness's recollection. [534]

INDICTMENT found and returned on December 10, 1964.

The case was tried in the Superior Court before *Sulli-
van*, J.

*Max L. Glazer* for the defendant.

*William A. Doherty*, Assistant District Attorney (*James
M. McDonough*, Legal Assistant to the District Attorney,
with him), for the Commonwealth.

CUTTER, J. Rogers was indicted for the murder on No-
vember 6, 1964, of Mrs. Patricia Campbell. Trial took
place from January 11 to 18, 1966, under G. L. c. 278,
§§ 33A–33G, as amended. The jury returned a verdict of
guilty of murder in the first degree with a recommendation
that the death sentence be not imposed. Rogers was sen-
tenced to life imprisonment. He appealed. The assign-
ments of error which have been argued are outlined below.

THE PRINCIPAL EVENTS OF NOVEMBER 6, 1964.

There was little dispute concerning what took place on or
before November 6, 1964, except with respect to (a) the

activities of Rogers and an acquaintance named Tony between about 3 P.M. and 6 P.M. on that day, and (b) if relevant, the extent of Tony's acquaintance with Mrs. Campbell prior to that date. There was evidence from which the following facts could have been found.

The hideously mutilated, nude corpse of Mrs. Campbell, a woman nearly thirty-seven years of age, was found shortly after 6 P.M. on November 6, in a room rented by Rogers on the third floor of a Boston lodging house. There was evidence from occupants of the house that about 5:55 P.M. to 6 P.M. Rogers left his room (rented a week before), surrendered his key, and departed from the building, saying to the janitor that his mother was sick and that he had to go to the Cape right away. One Gage, whose room was adjacent to that of Rogers, testified that about 6:15 P.M. Rogers knocked on his door. He had stains which looked like blood on his ear and on his hands. Rogers said to Gage, "I had a fight." One Raymond who lived on the floor "right below" Rogers' room was not in the building from 3 P.M. to about 5 P.M. He heard "quite a rumpus" on the floor above him for some ten minutes just about 5 P.M. He recognized Mrs. Campbell's voice. His door to the hall was open, and about 5:45 P.M. to 6 P.M. he saw Rogers come from the floor above, step into the bathroom for five minutes, and then go downstairs. While Raymond was in his room no one went upstairs prior to the noises he heard and no one went downstairs before Rogers left.

Rogers testified that he was in his room with Mrs. Campbell as late as 2:45 P.M. to 3 P.M. Rogers gave testimony (for convenience hereafter called the alibi testimony) that he went to Tony's room in another building so that Tony could go to Rogers' room to meet Mrs. Campbell and that Tony left him for that purpose. Rogers also claimed that he returned to his own room after dark, found Mrs. Campbell's body, "got frightened," and fled. Tony was identified by Rogers in the court room during the trial. He was not called as a witness either by Rogers or by the Commonwealth.

Rogers testified that, on the morning of November 6, Tony had introduced him to Mrs. Campbell, and that before that day he, Rogers, had seen Tony and Mrs. Campbell together on several occasions. The evidence concerning the extent of Tony's acquaintance with Mrs. Campbell was inconclusive.

Rogers admitted that he had been a heavy drinker for some time and that he and Mrs. Campbell drank frequently together during November 6. The evidence, wholly apart from the testimony (mentioned below) concerning Rogers' statements on November 17 and 18 after his arrest, warranted the conclusion that Rogers had been constantly in his room with Mrs. Campbell for at least three hours prior to 6 P.M. on November 6.

ARREST OF ROGERS AND POST-ARREST INTERROGATION.

On the evening of November 17, 1964, Rogers was arrested between 8 P.M. and 8:30 P.M. by two officers in a Boston cafe. He gave his name as James Perry. He was taken to Station 4, and was then transferred to police headquarters for fingerprinting. Later Rogers admitted his identity.[1] The testimony concerning what happened after Rogers left police headquarters to return to Station 4 is conflicting.

The police testimony would have warranted the following findings. One police sergeant (now a lieutenant) testified that about 10 P.M. he informed Rogers "that he didn't have to make any statements, and that he was entitled to counsel, and a telephone call, and that he could stand mute." At Station 4, Rogers was given a chance to call an attorney. He did speak with the wife of a legislator in Barnstable. Upon failing to reach the legislator, Rogers stated that there was nobody else he would like to call. Between 10:30 P.M. and 11 P.M. another sergeant from the headquarters homicide division began interrogating Rogers. He told Rogers that he "didn't have to answer" questions and

---

[1] Rogers explained the use of a fictitious name on the ground that he was wanted on charges of passing bad checks.

that he, the sergeant, would testify to Rogers' answers in court.

A police stenographer was present only after midnight during the later part of the interrogation of Rogers by the second sergeant.  Interrogation of Rogers by each sergeant before midnight was not recorded.  In the course of the interrogations, Rogers made admissions amounting to a confession and an acknowledgment that the alibi testimony was false.  These admissions did not include any admission that Rogers had mutilated Mrs. Campbell's body or any explanation of the circumstances of the mutilation.[2]  The second sergeant did not advise Rogers that he had "the right to consult a lawyer."

Police witnesses stated that Rogers, on the night of November 17, "had been drinking," that he "was under the influence of liquor," and that "his faculties had been impaired."  He was "coherent in his speech" and there was no difficulty in understanding his answers.  He did not fall asleep during the questioning.  The police stenographer saw Rogers for about an hour and "understood him perfectly, although at times he hesitated before answering."  At times during the interrogation, Rogers "stared into space" or "at the wall."

At 2 A.M. on the 18th, Rogers was "sober," and he had ceased to be under the influence of liquor about 11 P.M.  Police witnesses testified that no liquor was given to Rogers in the police station, although he had been served coffee; that he had not been beaten, slapped, threatened, or physically mistreated; and that no promises had been made to him to induce him to make a statement.  There was some conflict in the testimony of various police officers concerning the details of the interrogation and about who was present at various stages of it.

[2] In the absence of the jury, there were at the trial two voir dire examinations concerning the post-arrest interrogation of Rogers. One related to Rogers' motion to suppress certain evidence. The other was to determine whether an alleged confession by Rogers was voluntary. The judge refused to suppress the evidence and determined that the confession was voluntary. Thereafter the second sergeant was allowed to testify before the jury concerning the interrogation of Rogers, both before and after the police stenographer was present.

Rogers' version of the circumstances of his interrogation differed from the police version in two principal respects. First, Rogers denied that he had been advised of his constitutional rights and said that he had been refused permission to make a telephone call to a lawyer whom he knew. Second, he testified (a) that he had been subjected to various forms of physical abuse; (b) that he was "pretty drunk, [but] not completely"; (c) that he had been served whiskey by the police in his coffee, and had been given the wine which had been taken from him[3] upon his arrest, and (d) that he was falsely told by the first sergeant to question him that a statement was sought from him only as a "material witness" rather than as a suspect. Rogers claimed not to remember the admissions and statements made by him to the second sergeant to question him but asserted that, because of liquor and the alleged abuse, he "could have said anything."

Rogers testified that he made an exculpatory statement (essentially the alibi testimony) on the events of November 6, 1964, to the former sergeant which placed him prior to 6 P.M. on November 6, in Tony's room. He himself (in the alibi testimony) gave before the jury a similar exculpatory account of the afternoon's events.

1. The first group of assignments of error argued relates to the statements obtained following Rogers' arrest, based on the alleged denial to Rogers of the right to consult counsel, the taking of articles from Rogers' room, and the alleged failure to warn Rogers at the police station of his constitutional rights and of his statutory privilege of using the telephone (G. L. c. 276, § 33A, as amended through St. 1963, c. 212). Rogers contends that the evidence should have been suppressed before trial and should not have been admitted at the trial. The short answer to each assignment of error is that the trial judge, after the relevant voir dire examinations (see fn. 2), and the jury, after hearing the

---

[3] The two police officers who took Rogers into custody did not agree about what had been done with a partly consumed bottle of wine taken from Rogers at the time of his arrest.

testimony before them, were not required to believe Rogers' unsupported testimony tending to show that his confessions were not voluntary. The judge, and the jury as triers of the facts, heard and saw the police witnesses and Rogers. It was for them to appraise the sharply conflicting testimony. They could consider, as affecting Rogers' credibility, his long criminal record, introduced in evidence after he took the stand. The police testimony warranted the conclusion that Rogers (a) was given the opportunity to use the telephone; (b) was repeatedly warned (see *Commonwealth* v. *Kleciak,* 350 Mass. 679, 685–689, and cases cited) of his constitutional rights; (c) was afforded fair opportunity to get in touch with counsel; (d) was not induced to confess by physical maltreatment, by being furnished liquor, by threats, by promises or inducements, or by any improper method, and (e) made his confession voluntarily.

The jury could reasonably conclude that Rogers, even if influenced by liquor consumed by him prior to his arrest, did not so lose capacity to understand and to make himself understood as to render his statements involuntary. *Commonwealth* v. *Howe,* 9 Gray, 110, 112. See *Commonwealth* v. *Chapman,* 345 Mass. 251, 254; annotation, 69 A. L. R. 2d 361, 365. On this subject the judge instructed the jury that they must consider whether Rogers' "condition with regard to intoxication . . . [was] such as to render the confession involuntary." No exception was taken to the charge in this respect.[4]

The judge (fn. 2) and the jury were not bound to give weight to various inconsistencies (see e.g. fn. 3) in the police testimony. The discrepancies and inconsistencies could be found to be either without substantial significance or of a type to be expected when testimony is given some fourteen months after the events described.

There was no error in the failure of the judge to instruct the jury concerning Rogers' constitutional rights and concerning the principles governing evidence seized or ob-

---

[4] Cf. *Logner* v. *North Carolina,* 260 F. Supp. 970 (M.D. N.C.).

tained in violation of statutes or constitutional provisions. Whether evidence had been unlawfully obtained was a question of law for the judge, who passed upon it after proper voir dire examinations (fn. 2). The jury need not be given instructions on such issues. *Commonwealth v. LaBossiere,* 347 Mass. 384, 387. *Steele v. United States, No. 2,* 267 U. S. 505, 510–511. Cf. *Haynes v. Washington,* 373 U. S. 503, 516–518. Cf. also *Commonwealth v. Valcourt,* 333 Mass. 706, 710–711, and connected case, *Commonwealth v. Reynolds,* 338 Mass. 130. The jury were afforded opportunity to hear all Rogers' testimony in chief concerning his interrogation in the police station. They were told to "consider in determining whether . . . this confession was voluntarily given . . . where it was made, when it was made, was it under such pressure or hope or fear as to raise a doubt," and "whether . . . there was inducement, promise, threat, physical abuse of any kind."

The judge during the trial followed the approved Massachusetts practice of voir dire examinations (see fn. 2) to determine whether statements by the defendant were voluntary. The trial judge, after admitting the statements, left it to the jury to decide whether they also thought the statements were voluntary, free of any influence by his preliminary finding. *Commonwealth v. Marshall,* 338 Mass. 460, 461–462. See *Amado v. Commonwealth,* 349 Mass. 716, 720–721; *Jackson v. Denno,* 378 U. S. 368, 378–391.

The case was tried prior to the decision in *Miranda v. Arizona,* 384 U. S. 436 (decided June 13, 1966), but after the decision in *Escobedo v. Illinois,* 378 U. S. 478 (decided June 22, 1964). The judge could reasonably have concluded from the testimony (disregarding testimony which he apparently did not believe and was not required to believe) that Rogers' statements involved no violation of principles set out in the *Escobedo* case. We need not decide whether, if the *Miranda* case were applicable, it would require us to take any different view concerning the admissibility of Rogers' statements to the police. The new principles asserted in that case by a majority of the Supreme

Court of the United States need not be applied by us retro-
actively to cases where trial started before that decision.
*Johnson* v. *New Jersey,* 384 U. S. 719, 726–735.   Public in-
terest in law enforcement, the impracticability of retroac-
tive application of the *Miranda* principles, and the proba-
bility that police officers could not foresee the *Miranda*
decision, cause us to refrain from applying that case to any
greater extent than the *Johnson* case commands.   See *Com-
monwealth* v. *Morrissey, ante,* 505, 509–511; *Commonwealth*
v. *McCambridge, ante,* 516, 520–521; *Commonwealth* v.
*McGrath, post,* 534, 539.

2.   There was no error in admitting in evidence repulsive
pictures of the mutilated corpse, which left no gruesome de-
tail of this macabre event to the imagination.   The pictures
were duly authenticated.   They were relevant on the issue
whether the homicide was committed with extreme atrocity
and cruelty.   *Commonwealth* v. *McGarty,* 323 Mass. 435,
438–439.   *Commonwealth* v. *Smith,* 350 Mass. 600, 607, and
cases cited.[5]

3.   The judge adequately instructed the jury in effect
that, before they drew any inference of guilt from Rogers'
behavior after he left the scene of the homicide, they must
"be satisfied that . . . [his] acts or words" were caused by
consciousness of guilt of the crime of killing, and that their
probative effect, "in connection with all the other facts
established," was for the jury's determination.   *Common-
wealth* v. *Connors,* 345 Mass. 102, 105–106.   Cf. *Common-
wealth* v. *Fancy,* 349 Mass. 196, 201.

4.   The testimony of Gage, that Rogers told him in the
early evening of November 6 that he had been in "a fight,"
related to a relevant conversation in which Rogers partici-
pated close to the time of the homicide.   That Gage had
been drinking prior to the conversation went to the weight
of the evidence.   See *Commonwealth* v. *Bonomi,* 335 Mass.
327, 340.

5.   Raymond's testimony concerning the "rumpus" on
the floor above was admissible.   He had been shown to have

---

[5] See *Burns* v. *Beto,* 371 F. 2d 598 (5th Cir.).

had reasonable opportunity to observe and hear. He knew and had talked with Mrs. Campbell and could recognize her voice, although he conceded that in the circumstances it was "hard to tell," and that he had some animosity toward Rogers. The weight of the evidence was for the jury.

6. Instructions concerning the alibi testimony were given in connection with a full charge on the subject of the Commonwealth's burden of proof beyond a reasonable doubt and of the proper consideration of circumstantial evidence. The jury were told that the Commonwealth "must show . . . that the defendant was the murderer" and "that the accused had the opportunity and means to commit the crime." The specific instructions with respect to the alibi testimony were given in language closely similar to that found in *Commonwealth* v. *Webster,* 5 Cush. 295, 319. See *Commonwealth* v. *Geagan,* 339 Mass. 487, 518, cert. den. 361 U. S. 895. The charge taken as a whole did not place any improper burden of proof upon Rogers.

The judge did not have to give, in the language of certain requests, instructions in effect that evidence, as consistent with innocence as with guilt, was insufficient to sustain a conviction. Apart from the circumstance that the evidence as a whole was hardly susceptible of any such neutral interpretation, the judge's instructions concerning the Commonwealth's burden of proof were ample.

7. There was no evidence of significant provocation or naturally caused, sudden anger leading to the brutal killing of this woman who was only five feet three inches tall and weighed only 108 pounds. The essentially indisputable evidence about the multiple and serious injuries to Mrs. Campbell showed action which would have been impossible without some intent on the part of the killer sufficient to constitute malice aforethought. If this killing had been done by one who was sober, the act could only have been murder. Even if the killer had been sufficiently drunk so that the killing could reasonably be found not to constitute first degree murder on the basis of "deliberately premeditated malice aforethought" (see G. L. c. 265, § 1), this killer's act

would involve at least malice aforethought not deliberately
premeditated, and would not be converted into manslaugh-
ter. *Commonwealth* v. *Soaris,* 275 Mass. 291, 299–300.
*Commonwealth* v. *Hartford,* 346 Mass. 482, 490–491. See
*Commonwealth* v. *Peterson,* 257 Mass. 473, 477–478. Cf.
*Commonwealth* v. *Houston,* 332 Mass. 687, 690–691. There
was no evidential basis for finding Rogers guilty only of
manslaughter, and the judge could properly thus instruct
the jury.

8. The judge charged that "murder implies atrocity and
cruelty of the guilty party." He then proceeded, "But
there are degrees of criminality in this respect, even in the
. . . taking of a human life," and pointed out that it was
for the jury to determine "whether the crime was com-
mitted with such savagery or brutality as to constitute mur-
der committed with extreme atrocity or cruelty . . . one of
the three grounds for arriving at a first-degree murder."
The first sentence quoted above was in general in the lan-
guage of *Commonwealth* v. *Devlin,* 126 Mass. 253, 255. See
*Commonwealth* v. *Vaughn,* 329 Mass. 333, 337.

The evidence did not make it necessary or appropriate
for the trial judge to give a requested instruction that, if the
jury found the victim died from strangulation, subsequent
mutilation of the corpse could not be considered on the issue
of cruelty and atrocity. The medical testimony was in ef-
fect that no single cause of death could be identified and
that the mutilation was done at about the time of the other
injuries when Mrs. Campbell was "probably alive or in a
dying phase." See *Commonwealth* v. *Bartolini,* 299 Mass.
503, 516.

The judge was not required by the evidence before him to
give instructions concerning the motive of the murder. It
is not argued that the judge excluded any evidence offered
which was relevant to motive or that he precluded the jury's
consideration of such evidence. Motive was not an essen-
tial element of any crime charged. See *Commonwealth* v.
*Goldenburg,* 315 Mass. 26, 33. Motive (or its absence) was,
of course, irrelevant on the issue whether the killing was

first degree murder because accomplished with "extreme atrocity or cruelty." G. L. c. 265, § 1.

9. The judge charged that what the jury "did observe on the view is evidence to be . . . weighed . . . like any other evidence." Although what is seen on a view, in a "strict and narrow sense" is not evidence (see *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 29–30), it may be used in reaching a verdict. *Commonwealth* v. *Mercier,* 257 Mass. 353, 365. See *Berlandi* v. *Commonwealth,* 314 Mass. 424, 451–452. No exception was taken with respect to anything which happened during the view.

10. In view of *Fisher* v. *Swartz,* 333 Mass. 265, 268–271, it may well be that more expeditious methods of introducing Rogers' confession in evidence could have been pursued. See *Commonwealth* v. *Dougherty,* 343 Mass. 299, 306. In any event, there was no error (after the voir dire; see fn. 2) in permitting the sergeant who conducted the interrogation to use the transcript very fully to refresh his recollection.

11. After review of the entire transcript and record (see G. L. c. 278, § 33E, as amended through St. 1962, c. 453), we perceive no reason in justice for disturbing the judgment. See *Commonwealth* v. *Smith,* 350 Mass. 600, 613.

*Judgment affirmed.*