COMMONWEALTH *vs.* CHRISTOPHER BROWN & another
(and six companion cases).

Suffolk. March 27, 1968. — May 10, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Arrest. Search and Seizure. Evidence,* Admissions and confessions, Relevancy and materiality. *Practice, Criminal,* Assistance of counsel, Voir dire, Argument by prosecutor. *Error,* Whether error shown.

At the trial of indictments arising out of an armed robbery at a fur shop, evidence that police officers there shortly after the crime heard a description of the robbers and while investigating elsewhere received police radio messages giving the registration number and description of an automobile at the shop at the time of the crime and a description of its occupants and instructions to stop it and arrest its occupants, and that the officers came upon an automobile which precisely matched the given description and was occupied by men who in a general way conformed to the description of the robbers given at the shop warranted findings that the officers had reasonable cause to believe the occupants had committed the robbery, and that an arrest of them by the officers was lawful, even though made without a warrant, so that searches of them incidental to their arrest were lawful. [342–343]

An affidavit by a police officer, presented to a court clerk in support of an application for a search warrant in the afternoon following an

armed robbery at a fur shop, in substance that based on information from another officer working with the affiant in law enforcement which the other officer received from a reliable informant, who in the past had given him information that resulted in the arrest and convictions of other defendants, certain fur coats in white "Pilgrim" laundry bags were concealed in a designated apartment on the second floor at a specified address, when considered in its entirety with the reasonable inferences therefrom and in the light of common knowledge, complied with the requirements of G. L. c. 276, § 2B, and as matter of law set forth sufficient facts for the clerk to find probable cause for the issuance of the warrant, and the warrant and a search of the apartment were lawful. [345–346]

Evidence of statements made by the defendant in a criminal case to police officers in an on the spot inquiry by them immediately before they arrested him was not inadmissible at the defendant's trial under *Escobedo* v. *Illinois*, 378 U. S. 478, where it appeared that he had not requested an opportunity to consult his attorney or that he would have been denied the opportunity to do so. [348]

At the trial of indictments arising out of an armed robbery, evidence that within two hours after the crime and shortly after the arrest of a suspect the building in which he had an apartment was placed under police surveillance, that the defendant entered the building, that as a result of complaints by a woman police officers went through her backyard to the street behind the apartment building and stopped the defendant and had a conversation with him, and that on returning through the backyard voluntarily to meet the complainant he denied the trespass and then ran out of the yard and was chased by the officers and eventually found under a porch and arrested justified conclusions that the officers had probable cause to arrest the defendant when he decided to run and that his arrest was lawful, even though made without a warrant. [348]

There was no error at a criminal trial in denial of the defendant's motion for a voir dire in the absence of the jury as to the admissibility of his statements to and conduct before arresting officers prior to his arrest where no confession or admissions in the nature of confessions were involved. [348–349]

Where a defendant at a criminal trial failed to show that evidence allegedly improperly received by the judge at a voir dire in the absence of the jury ever came to the jury's attention, there was no reversible error in the receipt of the evidence. [349]

At the trial of indictments arising out of an armed robbery at a fur shop, no error appeared in the circumstances in a police officer giving the name of a defendant in answer to the question "Whose house was that," referring to a house near which another defendant was arrested, or in admitting testimony by another police officer as to the wearing apparel of the driver of a certain automobile when stopped by the officer before the robbery where such apparel corresponded to the attire of a driver of that automobile who carried furs in laundry bags to it from the fur shop during the robbery. [349–350]

A reference by the prosecutor in his argument to the jury at the trial of indictments for armed robbery at a fur store, that the defendant "is an expert on furs," was a permissible characterization in light of testimony that he had advised another participant in the robbery which furs should be taken. [350]

INDICTMENTS found and returned on April 27, 1965, and September 14, 1965.

The cases were tried in the Superior Court before *Paquet, J.*

The cases were submitted on briefs.

*Alfred P. Farese* for the defendants Brown & another.

*Robert A. Stanziani* for the defendant Zirpolo.

*Garrett H. Byrne,* District Attorney, & *Joseph R. Nolan,* Assistant District Attorney, for the Commonwealth.

KIRK, J. Christopher Brown and Robert Donati were convicted on three indictments charging armed robbery.[1] Donati was also convicted of operating a motor vehicle after his license had been suspended and before it was restored.[2] Anthony M. Zirpolo was convicted on three indictments charging, respectively, receiving stolen property, being an accessory before the fact to armed robbery in three counts, and being accessory after the fact to armed robbery in three counts. The three defendants were tried together under G. L. c. 278, §§ 33A–33G. All have appealed. They argue a total of fifty-six assignments of error, most of which center on three issues: (1) The lawfulness of the arrest of Donati and Zirpolo without a warrant, (2) the legality of the search warrant under which a search was made resulting in the recovery on the same day as the robbery of all of the stolen furs, and (3) the lawfulness of the arrest of Brown without a warrant. The remainder relate to rulings on evidence at the trial.

We summarize the evidence pertinent to the commission of the crimes and outline the evidence leading to the apprehension of the defendants. We point out, by way of preface,

---

[1] One of the indictments charged them with robbery of Carl Huerth, president and treasurer of Huerth and Huerth, Inc., of furs valued at $41,725 and $500 in money. Each of the other indictments charged them with the robbery of money from an employee.

[2] It was admitted at the trial that Donati's license had been suspended and had not been restored.

that as soon as the crime had been reported to the police, groups of officers from different operational units within the Boston Police Department reported to the scene and then fanned out on different missions or were on alert for further instructions, all with the common purpose of apprehending the criminals and recovering the goods. Some of the detailed evidence, not given in the narrative which immediately follows, is reserved for statement in connection with the disposition of the specific issues raised by the assignments of error.

On Friday morning, April 9, 1965, a man who introduced himself as "Mr. Larson" entered the shop of Huerth and Huerth, Inc., furriers, on the fourth floor of the building at 376 Boylston Street, Boston. For about twenty minutes or half an hour Huerth showed him furs and quoted prices. The man left. About 10 A.M. on Monday, April 12, 1965, Larson reappeared at the shop accompanied by an older man whom he addressed as "Sam," later identified in court as the defendant Brown by Huerth and by Finn, an employee. Brown had under his arm a flat package about the size of a "Life" magazine. Larson said to Huerth, "I didn't bring my girlfriend, but I brought my father. He will do just as well." Thereupon the two men drew guns, forced the four employees present to lie on the floor, and bound and gagged them. They took the employees' money from their wallets, about $400 from the store's cash box, and fifty-six furs valued at about $40,000. "Sam" advised Larson which furs to take. One of the employees observed the men placing some of the furs in a large laundry bag. After the men had left, Huerth called the police who promptly arrived in large numbers and conducted or heard the questioning of the victims.

About 10:20 A.M., three women who were reëntering 376 Boylston Street after a coffee break observed two men leaving the building carrying large white laundry bags marked "Pilgrim." The two men placed the bags in the rear seat of a "green Cadillac convertible car, late model," and got into the car. The driver got halfway out again and

removed a white tag which was under the windshield wiper. The two then drove off.

Shortly before 11:30 A.M. on the same day, four Boston police officers who had earlier been at the Huerth shop in response to the alarm were driving, in furtherance of the investigation, toward Revere by way of the vehicular tunnel to East Boston. As they emerged from the tunnel they received a police radio message giving the registration number and description of an automobile and its occupants which had been at 376 Boylston Street that morning. Thereafter, while proceeding along McLellan Highway in East Boston, they received a police message to stop the car and arrest its occupants. At 11:30 A.M., the officers observed a green Cadillac convertible enter McLellan Highway from Waldemar Avenue and turn right in the direction of Revere. The registration number was 409918. When the Cadillac stopped for a red light the officers stepped from their unmarked cruiser and arrested the two occupants, Donati, the operator, and Zirpolo, who was seated beside Donati. In Zirpolo's pocket was found a parking violation notice which had been placed on the car earlier that morning; in Donati's pocket was a driver's license issued to his brother Richard.

We pause to state the evidence regarding the whereabouts of the Cadillac convertible prior to its seizure at 11:30 A.M. The car was registered to one Nicholas Ventola of Everett. Zirpolo had borrowed it from Ventola at 3 A.M., April 12, 1965, allegedly so that he could take his wife home from the Revere night club where they then were. At 7 A.M. Officer Costa, an M.D.C. police officer, saw Zirpolo and one of the two Donati brothers together at a diner in Revere. Several minutes later he saw the two men riding in the green Cadillac convertible, registration 409918. He stopped the car. The driver, one of the Donatis, showed him the license of Richard Donati. Between eight-twenty and eight-thirty on the same morning a Boston police officer placed a parking violation tag on the windshield of a Cadillac automobile, registration 409918, which was illegally parked

near 364 Boylston Street, a building in the same block as 376 Boylston Street. As already stated the Cadillac had been seen at or near 376 Boylston Street about 10:20 A.M. At 11:00 A.M. the same Cadillac was observed, unoccupied, in a parking lot within 100 feet of a multiple apartment unit at 199 Faywood Avenue, East Boston. The window on the driver's side of the car was down.

The defendant Brown was arrested about 3 P.M. on April 12 in circumstances later to be stated. All of the stolen furs, in three white laundry bags marked "Pilgrim," were found in an apartment in East Boston occupied by Zirpolo's wife Sandra in the course of a search conducted under a warrant also to be discussed later. The man who called himself "Mr. Larson" has not been identified or apprehended.

One month before the trial, Zirpolo stopped his car near Beachmont Station and said to Officer Costa, "[Y]ou didn't see me that morning, did you?"

1. Donati and Zirpolo contend that there was no probable cause for their arrest and that, as a result, the evidence taken from them upon arrest should have been suppressed. We do not agree. We think that there was probable cause on either of two grounds. The officers had probable cause to make the arrest on their own initiative. They had been at the fur shop; they knew that a robbery had been committed by two men whose description they had heard at the shop; they then, en route to Revere, received a definite description including the registration number of the car suspected of being used in the crime. Fortuitously, they came upon the car which precisely matched the given description and was occupied by two men who in a general way conformed to the description given at the shop. On this information they could reasonably believe that the two men had committed a felony. *Commonwealth* v. *Holmes;* 344 Mass. 524, 525. *Commonwealth* v. *Bowlen,* 351 Mass. 655, 660. We think that the arrests were lawful also on the ground that the officers were ordered to make them as they proceeded to Revere to pursue their investigation. The arresting officers knew that other officers were working on the

investigation. "The . . . officers were engaged in a coöperative effort in the performance of their duty. The knowledge of one was the knowledge of all." *Commonwealth* v. *McDermott*, 347 Mass. 246, 249. It was not necessary that all information be transmitted over the police radio in order to justify the arrest by the officers who made it. It was enough that sufficient information had been gathered and evaluated to justify the issuance of the order to arrest the men in the described car. It was the officers' duty to obey. The arrests of Donati and Zirpolo were lawful and the searches incidental to the arrests were also lawful. *Commonwealth* v. *Mayer*, 349 Mass. 253, 255.

2. We consider the validity of the search warrant which resulted in the recovery of all of the stolen furs at 3:35 P.M. on April 12, 1965, in an apartment occupied by Zirpolo's wife. Detective Fawcett and Officer Donahue, both Boston police officers assigned to Division 7 in East Boston, together with other officers, were aware of the time and place of the arrest of Zirpolo and Donati and were directing their efforts to the recovery of the stolen goods and the apprehension of the other criminals. Zirpolo's mother's apartment at 218 Leyden Street, where Zirpolo lived, was placed under surveillance, as was the housing project unit at 199 Faywood Avenue where Zirpolo's wife Sandra lived.

Following a conversation with Detective Fawcett at approximately 2:15 P.M. Officer Donahue obtained a search warrant from the assistant clerk of the East Boston District Court, a person competent to issue such warrants. *Commonwealth* v. *Penta*, 352 Mass. 271, 273–274. In order to place this aspect of the case in its proper setting we make the following observations: The warrant before us was issued after June 23, 1964, the effective date of St. 1964, c. 557, § 3, amending G. L. c. 276 by adding thereto §§ 2A, 2B and 2C. To the date the warrant was issued and executed, April 12, 1965, no decision involving the amended statute had been made by this court. At the time of the trial of these cases, commencing September 27, 1965, one case dealing with affidavits under the amended statute had

been decided. *Commonwealth* v. *Lillis,* 349 Mass. 422. Since the trial of these cases the law governing the issuance of warrants under the amended statute has received considerable attention. *Commonwealth* v. *Dias,* 349 Mass. 583. *Commonwealth* v. *Rossetti,* 349 Mass. 626, 630–633. *Commonwealth* v. *Mitchell,* 350 Mass. 459, 462–464. *Commonwealth* v. *Colardo,* 351 Mass. 76, 78–79. *Commonwealth* v. *Monosson,* 351 Mass. 327, 328–330. *Commonwealth* v. *Penta,* 352 Mass. 271, 274–277. *Commonwealth* v. *Moran,* 353 Mass. 166, 168–171. *Commonwealth* v. *Cuddy,* 353 Mass. 305, 307–309. *Commonwealth* v. *Saville,* 353 Mass. 458, 459–461. Although Officer Donahue's affidavit would have been sufficient under the earlier statute, see *Commonwealth* v. *Owens,* 350 Mass. 633, 635, the question before us is whether his affidavit of April 12, 1965, in support of his application for the warrant complied with the requirements of G. L. c. 276, § 2B.[3]

Most of our decisions on the sufficiency of affidavits to support the issuance of a search warrant cite *Aguilar* v. *Texas,* 378 U. S. 108, and *United States* v. *Ventresca,* 380 U. S. 102, and point specifically to language in the latter case at p. 108 which we think is particularly apt here.[4] Our

---

[3] The affidavit, on the form set out in G. L. c. 276, § 2B (see *Commonwealth* v. *Monosson,* 351 Mass. 327, 328), reads in pertinent part: "April 12, 1965, . . . 2. . . . Based on information from Det. Robert Fawcett, that certain fur coats, in white Pilgrim laundry bags are concealed in the second floor, apt. #282, located at 199 Faywood Ave. in East Boston, Mass. That he received from a reliable informant who in the past has given him information that resulted in the arrest and convictions of other defendants. These articles taken in an armed robbery at the H[u]erth and H[u]erth Inc. located at 376 Boylston St. Boston, Mass. on this date. . . . The property for which I seek the issuance of a search warrant is the following . . . . 3-white Pilgrim Laundry bags, approximately 75 fur coats and stoles $550.00 in U. S. currency, var. denominations."

[4] "These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." See *Commonwealth* v. *Rossetti,* 349 Mass. 626, 632, fn. 5.

decisions establish that an affidavit may not be merely conclusory, but must state the underlying information which has led the officer to believe that a search is warranted. On the other hand, technical accuracy in the affidavit is not required. *Commonwealth* v. *Cuddy*, 353 Mass. 305. No evidence to support the issuance of the warrant may be considered which is not contained in the affidavit, even if the magistrate issuing the warrant was informed of the evidence. *Commonwealth* v. *Monosson*, 351 Mass. 327, 328. The affidavit, however, should be considered in its entirety. The information in the affidavit taken as a whole together with inferences which reasonably could be drawn from the information by a judicial mind may justify the conclusion that probable cause exists to make the search. *Commonwealth* v. *Moran*, 353 Mass. 166, 170. In the *Moran* case we upheld the validity of a warrant based on an affidavit which, so far as it related to the reliability of the informant, said: "I have received information from an informant, who since 1961 to the present time has furnished me reliable information relating to bookmaking activities and the dissemination of horse and dog racing information and results. This informant, who is closely associated with bookmakers, has furnished information which was always accurate and very beneficial to the successful prosecutions relating to these matters in federal and state courts." With minor editing as to form only, the affidavit before us would read: "Based on information from Det. Robert Fawcett that he received from a reliable informant, who in the past has given him information that resulted in the arrest and convictions of other defendants, certain fur coats, in white Pilgrim laundry bags are concealed in the second floor, apt. #282, located at 199 Faywood Ave. in East Boston, Mass."

We perceive no difference in substance between the affidavit in the *Moran* case and Officer Donahue's affidavit so far as they relate to the reliability of the informant. The fact that Donahue rather than Detective Fawcett made the application reciting the informant's reliability does not detract from its validity. Donahue and Fawcett were in truth

acting as partners in law enforcement, a truth which is readily inferable from the face of the affidavit. Little need be said about the sufficiency of the underlying facts given by the informant. The promptness of the information, the specificity of the observations, the particularity of detail as to the location all strongly point to the conclusion, or reasonably permit the inference, that the hitherto reliable informant saw the described items at the precise place stated or that he saw them being carried into the building by a person or persons who to his knowledge had access in the building only to the apartment stated. Although, as the judge commented, the affidavit was far from being a model to be followed, it provided sufficient basis for the issuance of the warrant. The warrant and search were lawful. All assignments which arise from the alleged insufficiency of the affidavit show no error.

3. We summarize the testimony which bears upon Brown's contentions that he was unlawfully arrested, that his statements to and conduct in the presence of the arresting officers should not have been admitted in evidence, and that it was error to have denied him a voir dire when he requested it. After Zirpolo's arrest at 11:30 A.M. on April 12, Boston Officers Twohig and Scagnoli placed under surveillance a building at 218 Leyden Street in which Zirpolo and his mother had an apartment. About 12:30 P.M. they saw a man, later identified as Brown, arrive in a taxicab. As Brown left the cab, he spoke to a woman who came out of 218 Leyden Street. The woman entered the cab and Brown entered the building. Officer Curtin of the robbery squad arrived. He had been among the first to report at the fur shop in the morning, and had participated in the arrest of Zirpolo and Donati on McLellan Highway. About three o'clock, a woman beckoned the officers. As a result of conversation with her, Officers Curtin and Twohig went into the backyard, climbed onto a table and over a wall ten feet or more high, and went through another backyard to the street behind Leyden Street. They observed Brown and a boy walking together. Curtin called out and Brown stopped.

Curtin asked Brown's name. Brown replied, "Frank Secori." Brown's counsel excepted to the admission of any conversation with Brown. The judge asked Officer Curtin if Brown had been placed under arrest. Officer Curtin said he had not. The judge ruled that Brown's conversation with the officers was admissible and denied Brown's request for a voir dire. The district attorney then elicited from Officer Curtin the following testimony, "I asked him where he lived? He said, 'Revere.' I said, 'What are you doing up here?' He said, 'I am walking.' I said, 'What are you walking in the backyards for?' He said, 'I wasn't in any backyard.' I said, 'Where abouts in Revere do you live?' 'Just Revere.' I said, 'The lady claims you are in her backyard.' I says, 'You have no objection to going back and talking to her, do you?' He said, 'No.' I said, 'All right, let's go.'" On cross-examination Officer Twohig testified that he had asked the boy, in Brown's presence, why he had taken Brown through the backyards. The boy replied that Brown had said he wanted to "get out of the house and that he would buy . . . [the boy] a new bicycle" if he would take him out. As the three men began to return through the backyards, they encountered a woman standing in a doorway. Officer Curtin testified that in Brown's presence "I asked the woman if she had seen the gentleman, Brown? And she said, 'Yes.' I asked her, 'Where?' She said, 'He just went through my yard.' Mr. Brown spoke up, said, 'You are mistaken, Lady.' She says, 'You went through my yard. I was sitting in the window and I saw you and these two men followed right after you.'" When the group reached the wall, Brown went over first and, while the others were on top of the wall, ran out of the yard. The officers chased him and eventually found him under a porch. They arrested him on a charge of armed robbery.

Contrary to Brown's contentions, there was no reversible error in the judge's rulings concerning the episode near 218 Leyden Street which resulted in his arrest. Again we note that the trial was held in September, 1965. This was after the decision of *Escobedo* v. *Illinois*, 378 U. S. 478

(June 22, 1964), but before the decision of *Miranda* v. *Arizona*, 384 U. S. 436 (June 13, 1966). The rules announced in the *Escobedo* case therefore apply; those from the *Miranda* case do not. *Johnson* v. *New Jersey*, 384 U. S. 719, 733. *Commonwealth* v. *Rogers*, 351 Mass. 522, 530. The *Escobedo* case did not make Brown's statements to the police inadmissible. He had not requested an opportunity to consult his attorney; there is no suggestion that he would have been denied the opportunity. *Commonwealth* v. *Ladetto*, 349 Mass. 237, 244. *Commonwealth* v. *Chase*, 350 Mass. 738, 742. Nor was the testimony made inadmissible as the "fruit" of an illegal arrest. See *Wong Sun* v. *United States*, 371 U. S. 471, 486–487. No arrest took place when Brown accompanied the officers voluntarily to meet the woman who had complained. *Commonwealth* v. *Slaney*, 350 Mass. 400, 405–406. The circumstances called for an on the spot inquiry of the kind which the police officers conducted and justified the action which they took as the inquiry developed. *Commonwealth* v. *Lehan*, 347 Mass. 197, 207. *Commonwealth* v. *Lepore*, 349 Mass. 121, 124–125. See *Commonwealth* v. *Young*, 349 Mass. 175, 178. We think it is clear that probable cause to arrest came into being at the same time that Brown made his decision to run in order to avoid arrest. The evidence established probable cause for arrest. It also tended to show consciousness of guilt. *Commonwealth* v. *Connors*, 345 Mass. 102, 105. *Commonwealth* v. *Smith*, 350 Mass. 600, 606–607. Coupled with the positive court room identification of Brown as one of the robbers by Huerth and Finn, both victims of the robbery, it was sufficient to convict him.

We think also that there was no error in denying Brown's motion for a voir dire. No confession was involved. *Commonwealth* v. *Marshall*, 338 Mass. 460, 461. Nor did it appear that Brown's statements or answers or failures to answer were admissions in the nature of a confession of any crime. It was simply a case of hearing testimony of the officers' observations of Brown upon his arrival at 218 Leyden Street, of their observations of him two hours later

following a complaint by the occupant of the building, of Brown's replies to police questions, and of his responses to statements made by third persons about his surreptitious attempt to leave the premises, all of which, added to the general description given earlier by the victims, was sufficient to generate a reasonable belief that Brown had participated in the crime.    *Commonwealth* v. *Holmes,* 344 Mass. 524, 525.

4. Donati points to certain evidence which it is claimed was improperly received by the judge at the voir dire.   As already pointed out, the arrests of Donati and Zirpolo were lawful.   In any event, Donati fails to show that any of this evidence, received in the absence of the jury, ever came to the attention of the jury.   Since no prejudice has been shown there can be no reversible error.

5. The defendants assign as error the admission of certain testimony before the jury.   Brown and Zirpolo assign the following testimony by a Boston police officer.   Q. "Whose house was that, 218 Leyden Street?"   A. "Mr. Zirpolo's." The objection was made after the answer was given.   There was no motion to strike.   On its face the question reasonably appears designed to elicit who lived at the address and the answer appears to be based upon the officer's personal knowledge.   If the answer was thought untruthful or erroneous, that fact should have been developed by cross-examination, The issue should not be presented to us on appeal in this fragmentary fashion.   The burden is on the defendants to show error.   *Donahue* v. *Kenney,* 330 Mass. 9, 12.   *M. S. Kelliher Co.* v. *Wakefield,* 346 Mass. 645, 647.   No error appears.   There was likewise no error in permitting Costa, the M.D.C. officer, to testify that the driver of the Cadillac convertible in Revere shortly after 7 A.M. was wearing a dark top coat, a black sport jacket, greenish gray pants and a white shirt with no tie.   The evidence had probative value.   It corresponded to the attire of the driver who carried the laundry bag or bags to the Cadillac at 376 Boylston Street, as testified to by one of the witnesses to that act: "black jacket, grey pants and a white shirt with no tie."

When arrested Robert Donati had on his person the license of his brother Richard. The driver of the car at 7 A.M. also had the license of Richard Donati. The evidence objected to, therefore, had some tendency to show that the person who carried out the laundry bags was Robert Donati, the defendant. It was therefore admissible.

Other argued assignments relating to the admissibility of testimony are so frivolous as not to merit discussion.

6. Brown alleges error in overruling of his objection to the district attorney's reference in his argument to the jury: "That Mr. Brown is an expert on furs —." This was a permissible characterization in light of the testimony that, as "Sam," Brown had advised Larson what furs should be taken.

7. There was no error in denying the motions for directed verdicts. The judge's charge was complete and free from error. There was a case for the jury on all the indictments.

*Judgments affirmed.*