COMMONWEALTH *vs.* WILLIAM R. MORRISSEY.

Suffolk.   November 7, 1966. — January 4, 1967.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Evidence,* Admissions and confessions, Failure to produce witness.   *Constitutional Law,* Admissions and confessions, Assistance of counsel, Due process of law.   *Practice, Criminal,* Assistance of counsel, Fair trial.   *Federal Law.   Arrest.   Homicide.   Wanton or Reckless Conduct.   Firearms.*

If the Federal constitutional standards set forth in *Miranda* v. *Arizona,* 384 U. S. 436, had been applicable, statements made by the defendant in a Massachusetts criminal case during a police custodial interrogation after he had been informed that he was entitled to have a lawyer present and had been asked if he wanted to have one attend and he had replied "I don't have any," would have been inadmissible by reason of failure to advise him that if he was indigent a lawyer would be appointed to represent him.   [508–509]

Under *Johnson* v. *New Jersey,* 384 U. S. 719, the Federal Constitution did not require the application of the principles set forth in *Miranda* v. *Arizona,* 384 U. S. 436, to a Massachusetts criminal case tried before the date of the *Miranda* decision although on that date the defendant's conviction had not become final.   [509, 511]

Under the law of Massachusetts, this court declined to require that in a police custodial interrogation of the defendant in a criminal case the police, besides advising him of his right to have counsel present, must advise him that if he is indigent counsel will be appointed.   [509–510]

Nothing set forth in *Johnson* v. *New Jersey,* 384 U. S. 719, alters the requirement that a statement made to police by the defendant in a criminal case must have been made voluntarily if it is to be admissible at the trial.   [511]

Evidence at the trial of an indictment for manslaughter that three days after the shooting of the victim the police were told by two persons who had been present at the shooting that the defendant had shot the victim, and that the following day the police were told that the defendant wanted to give himself up and they arrested him at a prearranged place warranted findings that the police had reasonable cause to believe that the defendant had committed a felony and that the arrest was lawful, even if made without a warrant, so that statements made by the defendant during a police custodial interrogation were not inadmissible at his trial as having been obtained as "the fruits of . . . [an] illegal arrest" and in violation of his rights under the Fourth Amendment to the Constitution of the United States.   [511–512]

Findings that conduct of the defendant in a criminal case was wanton and reckless and that he was guilty of involuntary manslaughter were warranted by the evidence at his trial, including a statement to police by the defendant that he had found a gun in the cellar of a house, knew it was loaded, and did not remove the bullets, that while in the kitchen he "had the gun and went to turn around" and was "going to pull the trigger and shoot it in the wall, and the . . . [victim] stepped in front of it, . . . [that the victim] fell . . . and . . . [the defendant said he] shot him," and that "as far as sobriety" was concerned the defendant was "Pretty well gone." [512]

Conviction of a defendant upon an indictment for carrying a firearm on his person in violation of G. L. c. 269, § 10, as amended, was warranted where there was evidence at his trial that he had carried a gun from the cellar of a house to the kitchen just before a man was shot there and that the defendant had kept possession of the gun after the shooting, at least long enough to dispose of it. [512]

There was no denial of due process of law to the defendant in a criminal case by reason of alleged prejudicial pre-trial publicity resulting from reports by several newspapers of a judge's decision allowing the Commonwealth's motion for specifications relating to the defendant's motions to suppress evidence where it appeared that the newspaper articles mentioned the defendant's name and the charge against him only by way of background and were not concerned with his guilt or innocence nor with the circumstances of the alleged crime, but rather with a novel ruling of law by the judge reflecting a community concern over recent decisions of the Supreme Court of the United States. [512–514]

At the trial of a criminal case in which the defendant in his closing argument commented on the Commonwealth's failure to call a certain police officer, there was no ground for a declaration of a mistrial by reason of the judge's statement that the defendant had no right to make such comment inasmuch as the officer was "equally available to . . . [the defendant] and was in Court," where there was no indication that the officer would have given testimony detrimental to the Commonwealth's case or helpful to the defendant [514–515]; there was no merit in an argument of the defendant, who did not testify, that the judge's statement "was unfair comment on the defendant's availing himself of his constitutional right to rest on the Commonwealth's case," in view of the judge's adequate instructions. [515]

Any prejudice to the defendant at a criminal trial from heated exchanges between the prosecution and defence lawyers was dissipated by the judge's prompt instructions to the jury to disregard the exchanges. [515]

At the trial of indictments for involuntary manslaughter and for unlawfully carrying a firearm, the judge's instructions to the jury adequately covered the law and it was not necessary for him to give instructions requested by the defendant. [516]

INDICTMENTS found and returned on November 6, 1964.

The Commonwealth's motion for specifications in connection with the defendant's motion to suppress evidence was

heard and allowed by *Tauro, C.J.* The motion to suppress was denied by, and the case was tried in the Superior Court before, *Quirico, J.*

*Michael A. Molloy* for the defendant.

*John A. Pino,* Assistant District Attorney, for the Commonwealth.

SPIEGEL, J. The defendant was tried on two indictments, one charging him with manslaughter and the other with unlawfully carrying a firearm. The jury returned verdicts of guilty on both indictments. The defendant was sentenced to serve concurrent terms of from seven to ten years on the manslaughter indictment and from two and one-half to three years on the other indictment. He has appealed under the provisions of G. L. c. 278, §§ 33A–33G. The case is here on a summary of the record, a transcript of the evidence, and assignments of error.

The material evidence consisted of testimony of one Cappellano, a person present during the events which led to the indictments, one Connolly, a police sergeant, one Gravel, a ballistician, and a statement which the defendant had made to the police. Cappellano testified that on the evening of October 10, 1964, he was present together with the defendant, Dennis Mahoney (the deceased), and one O'Toole, in an abandoned house in South Boston.

He first stated that he could not remember whether the defendant was drinking but later in response to the following question, "You want to leave it that you are the only one that was drinking?" he answered, "Yes, sir." While all were present in the kitchen he heard a gunshot, turned around and saw the deceased fall to the floor. The defendant was bending over the deceased but Cappellano didn't "remember seeing anything in . . . [the defendant's] hand." The deceased was bleeding, and a cab was called to take him to a hospital. He died as a result of the gunshot wound.

Connolly testified that sometime after the shooting he went to Cappellano's residence where he had Cappellano empty all the trash barrels. A gun in a paper bag was

found in one of the barrels. The gun was turned over to the ballistician who testified that the bullet which was found in the head of the deceased was fired from that gun.

The statement of the defendant, which was made to the police four days after the shooting, was read to the jury by one Stapleton, a stenographer. In this statement the defendant said that he found a gun in the cellar of the house, knew it was loaded, and did not remove the bullets. He kept the gun in his hand and carried it upstairs to the kitchen. He said that while in the kitchen "I had the gun and went to turn around. I was going to pull the trigger and shoot it in the wall, and the kid stepped in front of it, and that is all I remember. He fell, and I yelled, and I said, 'I shot him,' and he fell. He stepped right in front of it. It was accidental. I got down and felt his heart, and the next thing we called a cab and took him to the hospital." He said that everyone had been drinking and when asked what his condition was that night "as far as sobriety" said, "Pretty well gone."

1. Assignments 2, 9, and 10 relate to the admission in evidence of the defendant's statement to the police and the denial of his motions to suppress that evidence. The defendant argues that the statement was obtained during a police custodial interrogation without the benefit of counsel being present, and thus he was denied his rights under the Fifth, Sixth, and Fourteenth Amendments to the Federal Constitution.

During the defendant's interrogation the following colloquy took place. Q. "I am going to ask you some questions concerning the shooting of one Dennis Mahoney sometime Saturday night, October 10th. You don't have to answer any of my questions. You understand that?" A. "I will answer them." Q. "Do you understand that the questions I ask you and the answers you give me will be testified to in Court in the event you become a defendant. Do you understand that?" A. "Yes." Q. "And in all probability you will become a defendant in this case. You also are entitled to have an attorney here if you wish. Do

you understand that?" A. "Yes." Q. "Do you want to have an attorney here?" A. "I don't have any." Q. "Now that you have been informed of your rights, do you still desire to answer my questions?" A. "Yes."

If the standards in *Miranda* v. *Arizona,* 384 U. S. 436, 473, were applicable to this case we would be compelled to reverse the judgment. "In order fully to apprise a person interrogated of the extent of his rights under this system . . ., it is necessary to warn him not only that he has the right to consult with an attorney, *but also that if he is indigent a lawyer will be appointed to represent him.* Without this additional warning, the admonition of the right to consult with counsel *would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one"* (emphasis supplied). The warning given to the defendant fell short of these requirements. The defendant's statement that he did not have a lawyer cannot be taken as an effective waiver of his right to counsel.

In *Johnson* v. *New Jersey,* 384 U. S. 719, 721, the court held that the *Miranda* case "applies only to cases in which the trial began after . . . [June 13, 1966]." The trial of the instant case began on January 26, 1966, and thus the rules of *Miranda* are not required, as a matter of Federal constitutional law, to be applied here.

According to the *Johnson* case this defendant had no Federal constitutional right to receive the additional instruction from the police that he was entitled to have a lawyer appointed if he could not afford to hire one. Whether to apply the *Miranda* rule retroactively as a matter of Federal constitutional law was not left to the discretion of the States; but it was left to the discretion of the States to decide whether a State's own law required adoption of *Miranda* type rules and to what extent such rules should apply. The court in the *Johnson* case, *supra,* 733, said, "Of course, States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is

required by this decision.'' We are not inclined to do
so, nor is there any law in this Commonwealth which re-
quires us to do so.   Other State courts have done likewise.
*Mathis* v. *State,* 280 Ala. 16, 25.   *Parson* v. *State,* 8 Storey
[Del.]     ,     .[1]  *People* v. *Myers,* 35 Ill. 2d 311, 319.
*People* v. *Griffin,* 4 Mich. App. 604, 606–610.   *State* v. *Cade,*
268 N. C. 438, 441.   *Commonwealth* v. *Cheeks,* 423 Pa. 67, 74.

It may be argued that we have heretofore applied newly
announced principles of Federal constitutional law to cases
before us in regular course for decision even though the de-
cisions of the Supreme Court of the United States cre-
ating those principles had been handed down subsequent to
the trials of such cases (e.g. *Commonwealth* v. *Spofford,*
343 Mass. 703, 706–707; *Commonwealth* v. *McCarthy,* 348
Mass. 7, 11; *Commonwealth* v. *Guerro,* 349 Mass. 277, 280–
281; *Commonwealth* v. *Kerrigan,* 349 Mass. 295, 298) and
that we should continue to do so.   But the decisions in those
cases were based on the assumption that the Federal Con-
stitution required at least such limited retroactivity.   In
*Dirring, petitioner,* 344 Mass. 522, 523, which involved a
petition for habeas corpus and which was decided before
the case of *Linkletter* v. *Walker, Warden,* 381 U. S. 618, we
said, ''Retrospective effect of the *Mapp* rule is enshrouded
in doubt.   We do not puzzle as to something which must be,
for us, inscrutable.''   We held that ''no issue as to illegally
seized evidence was brought here by an appropriate appel-
late procedure . . . following the trial of the indictments,''
and hence that it was unnecessary to decide the retrospec-
tive effect of the *Mapp* rule.   The *Linkletter* case validated
the result in that case by holding that the *Mapp* case applied
only to cases in which the conviction had not become final
before the decision of the *Mapp* case.   But the opinions in
the *Linkletter* case, *supra,* 629, and the *Johnson* case made
clear that the Supreme Court of the United States has re-
served the general power to decide whether a rule should be
given general or limited retrospective effect.   Thus, there

[1] 222 Atl. 2d 326, 333–334.

is no inherently significant difference between a case before us on collateral attack and one before us in regular course for decision which dictates whether a new Federal rule should be applied retroactively. The fact that the defendant's convictions in the instant case had not become final on the date of the decision of the *Miranda* case is irrelevant in the light of the *Johnson* case.

As we stated in *Commonwealth* v. *Spofford, supra,* 707, an appeal "before us in regular course for decision" will be decided "on the law as it presently stands." The law, both Federal and State, as it presently stands, does not confer the benefits of the *Miranda* case on this defendant.

The requirement that a statement made to the police be voluntary has not been altered by the *Johnson* case, *supra,* 730. *Davis* v. *North Carolina,* 384 U. S. 737, 740. The judge, in denying the defendant's motion "to abate, dismiss and/or [*sic*] quash," found that the defendant's statement was made voluntarily. Evidence of the voluntariness of the statement was taken on voir dire and the judge again ruled that the statement was made voluntarily. The jury also heard evidence of the voluntariness of the statement and were properly instructed by the judge to disregard the statement if they found it was not voluntarily given.

The defendant also argues that his rights under the Fourth Amendment to the Constitution were violated because "he was illegally arrested and illegally detained in custody before being brought to a Court. . . . His statements were the fruits of the illegal arrest." The circumstances leading to the defendant's arrest were as follows. On October 13, 1964, the police spoke to Cappellano and O'Toole who were present at the shooting. Each of them said that the defendant shot the victim. A police teletype went out for the arrest of the defendant for murder. On October 14, one O'Brien telephoned the police stating that the defendant wanted to give himself up, whereupon the police went to a prearranged intersection and made the arrest.

On these facts it is clear that the police had reasonable cause to believe that the defendant had committed a felony.

The questioning of the defendant was incident to a valid arrest and the introduction of his statement at the trial did not violate his rights under the Fourth Amendment to the Constitution. *Commonwealth* v. *Holmes,* 344 Mass. 524, 525.

2. Assignment 13. The defendant's motion for a directed verdict on the manslaughter indictment was properly denied. There was ample evidence from which the jury could have found that the defendant's conduct was wanton or reckless. See *Commonwealth* v. *Atencio,* 345 Mass. 627, 631.

The motion for directed verdict on the indictment for unlawful possession of a firearm, under G. L. c. 269, § 10, as amended, was also properly denied. Although temporary possession during the actual shooting would not be sufficient under the statute, *Commonwealth* v. *Atencio, supra,* there was evidence from which the jury could find that the defendant carried the gun in the house before the shooting and kept possession of it after the shooting, at least long enough to dispose of it.

3. Assignments 1, 3, 4, 5, 7, and 8 relate to the alleged prejudicial effect of certain pre-trial publicity. After the defendant had been indicted he filed motions to suppress "the introduction in evidence of any statement . . . made to [the] police after his arrest . . . because the said arrest was made in violation of the defendant's rights . . . [under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution]." After a hearing, a judge granted the Commonwealth's motion for specifications relating to the defendant's motions to suppress. He filed "Findings and Order Re: Commonwealth's Motion for Specifications." The defendant asserts in his brief that "[t]hese were received . . . with an avalanche of publicity in all media of communication. It was reported in direct quotes that the District Attorney publicly praised the decision and that he was going to send the decision all over the country. . . . Whether it was intentional or not, this was tampering with potential jurors, the readers and listeners and viewers of

Suffolk County.'' This sweeping characterization is, at the very least, an extravagant exaggeration.

The so called ''avalanche of publicity in all media of communication'' consisted of articles in several newspapers in which the judge's decision was reported.[2] The defendant's name and nature of the charge against him were mentioned in the newspaper articles only by way of background.[3] It is true, as we said in *Opinion of the Justices,* 349 Mass. 786, 788, that ''prejudicial trial publicity generated or disseminated outside the court room [is an] . . . evil of growing magnitude [and] has been deplored in decisions of ours and of the Supreme Court of the United States. See, for example, *Commonwealth* v. *Geagan,* 339 Mass. 487, 501; *Sandrelli* v. *Commonwealth,* 342 Mass. 129, 138; *Commonwealth* v. *Crehan,* 345 Mass. 609; *Irvin* v. *Dowd, Warden,* 366 U. S. 717; *Rideau* v. *Louisiana,* 373 U. S. 723.'' To this list should be added *Estes* v. *Texas,* 381 U. S. 532, and *Sheppard* v. *Maxwell, Warden,* 384 U. S. 333. It seems clear to us that the concern of the press in the instant case was not with the guilt or innocence of the defendant, nor with the circumstances of the alleged crime, but rather with a novel ruling of law reflecting a community concern over recent decisions of the Supreme Court of the United States. The most liberal reading of *Sheppard* v. *Maxwell, Warden,* 384 U. S. 333, cited by the defendant, does not support his claim

---

[2] The focus of the publicity was on the closing parts of the decision in which he said, ''There is a growing feeling that the pendulum of the law has swung in favor of the defendant. Lest it swing too far, it might be well to pause and reflect from time to time concerning the rights of the public. It is difficult to disagree with the statement of Justice Frankfurter who said, 'As good a test as any of a civilized society is the treatment accorded those accused of crime.' But this thesis could well constitute 'mocking rhetoric' unless the law with equal zeal protects the public as well.'' The articles also referred to the ''unprecedented'' nature of the decision and to the concern of the judge that a ''fishing expedition'' on the part of the defendant might be invited if the court did not have ''discretionary power to permit the prosecution to inquire preliminarily by way of a motion for specifications as to the basis of the allegation of unlawful conduct on the part of law enforcement officers.''

[3] In a typical example the article in one newspaper, on the front page, stated that ''[the judge's] comments were in a written reply to cross-motions by defense counsel and prosecution concerning suppression of certain evidence in a Suffolk County manslaughter case.'' On page 26 the newspaper article continued, '' [The counsel for the defendant,] charged with fatally shooting . . . [the deceased] in South Boston last October 10, filed the motions to suppress.''

of a denial of due process as a result of pre-trial publicity.

In accordance with the foregoing there was no error in the denial of the motion to ''abate, dismiss and/or [*sic*] quash the indictments''; refusing to admit four clippings[4] as exhibits at the hearing on the defendant's motion to suppress certain evidence; denying the defendant's motion to withdraw his pleas of not guilty, in order to consider his motion to ''abate, dismiss and/or [*sic*] quash the indictments''; the manner in which the judge questioned the jury about whether they had ''read anything in any newspapers relating to this case, or . . . [had] heard any radio broadcast or heard or seen any television broadcast relating to this case''; the refusal of the judge to question the jury specifically on whether they had seen any of the publicity given to the decision granting the Commonwealth's motion for specifications (*Commonwealth* v. *Ladetto,* 349 Mass. 237, 245); the refusal of the judge to allow the defendant's challenge to all the jurors. See *Commonwealth* v. *Geagan,* 339 Mass. 487, 499, 500, 504.

4. Assignments 14 and 15. During his closing argument the defendant's counsel commented on the failure of the Commonwealth to call Lieutenant Sherry, the police officer whose interrogation of the defendant had been introduced in evidence. Upon the objection of the Commonwealth the judge said, ''[Y]ou cannot comment on the failure of the Commonwealth to call a witness who was equally available to you and was in Court.'' The defendant excepted to that ruling and moved for a mistrial. He argues that he ''can fairly comment in his argument on the failure of the Commonwealth, which has the burden of proof, to produce a witness who can testify on the subject of the in-custody cross-examination of the defendant.''

In *Commonwealth* v. *O'Rourke,* 311 Mass. 213, 222, we said, ''It is frequently held that where a witness is equally

---

[4] These clippings were of newspaper reports of remarks made by the judge who had granted the Commonwealth's motion for specifications. The remarks were made at a regional meeting and concerned the recent constitutional cases of the Supreme Court of the United States. The defendant was not mentioned.

available to either party no inference can be drawn against either for not calling him. . . . But there is no hard and fast rule to that effect. Whether an inference can be drawn from the failure to call witnesses necessarily depends, as with inferences generally, upon the posture of the particular case and the state of the evidence.'' There is no indication that Lieutenant Sherry would have given testimony that would be detrimental to the Commonwealth's case or helpful to the defendant. The judge did not err in ruling that no inference could be drawn from the failure of the Commonwealth to call him.

There is no merit in the defendant's argument that the judge's remark ''was unfair comment on the defendant's availing himself of his constitutional right to rest on the Commonwealth's case.'' The judge adequately instructed the jury on this point.[5]

5. Assignments 6, 11, and 12.[6] At various times during the trial there were heated exchanges between the prosecution and defence lawyers. The only relevant argument made by the defendant here is that these exchanges may have ''incite[d] jury and judge to convict the defendant.''

In so far as the jury may have heard any of these remarks, the judge promptly instructed the jury to disregard them.

6. Assignments 16, 17, and 18 relate to the judge's charge to the jury. The defendant requested the judge to

---

[5] ''The Defendant did not testify at this trial. We have a statute which says that a Defendant in the trial of an indictment . . . shall at his own request, but not otherwise, be allowed to testify; but his neglect or refusal to testify shall not create any presumption against him.

''Apart from that statute, a Defendant has a constitutional right not to incriminate himself. The Defendant in a criminal case cannot be compelled to testify at his trial. He may testify if he elects, but, if he doesn't choose to, he may not testify; and, if he exercises that right not to testify, as this Defendant did, no inference unfavorable to the Defendant can be drawn by the jury by reason of his failure to testify.''

[6] Assignment 12 relates to the qualifications of a ballistician who was permitted to answer a question to which the defendant excepted. The defendant in his brief, however, does not argue on the issue of the admissibility of the question that refers to a dispute between the defendant and the Commonwealth regarding an ''agreement'' between them. Our comments in regard to assignments 6 and 11 are equally applicable to this issue.

distinguish between momentary and temporary possession; to state that "the harm resulting is not to be a factor in their determination but rather the conduct that caused the harm"; and "to consider . . . the relationship of the dead man to the parties." "[I]t has been held that a person who handles a dangerous weapon in such a manner as to make the killing or physical injury of another a natural and probable result of such conduct can be found guilty of involuntary manslaughter, although he did not contemplate such a result. *Commonwealth* v. *Hawkins,* 157 Mass. 551, 552–553." *Commonwealth* v. *Bouvier,* 316 Mass. 489, 494–495. The judge's instruction adequately covered the law of manslaughter and unlawful carrying of a firearm[7] and it was not necessary for him to instruct the jury as requested by the defendant.

*Judgments affirmed.*

---

[7] "'If the Defendant handled such a revolver only momentarily at a time when it was shot or, whether it was shot or not, if he handled it only momentarily, that is not carrying it. The offense is not the handling or having a gun in your hand, but the carrying of it on your person. . . . [I]n deciding whether it was carried by the Defendant on his person you may consider whether he carried it before, during, or after the alleged shooting.'"