COMMONWEALTH *vs.* JOSEPH F. LEPAGE
(and three companion cases[1]).

Middlesex. February 6, 1967. — April 27, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Practice, Criminal,* Suppression of evidence, Opening statement by prosecutor, Assistance of counsel. *Arrest. Evidence,* Admissions and confessions; Presumptions and burden of proof; Res gestae; Opinion: expert; Photograph; Judicial discretion; Relevancy and materiality; Descriptive words; Of trailing by dog. *Constitutional Law,* Assistance of counsel, Admissions and confessions. *Homicide.*

The defendants in a criminal case showed no harm from action by the trial judge in advance of trial denying without prejudice motions to suppress subsequently heard upon a voir dire during the trial. [408–409]

1 **Commonwealth** *vs.* **Herbert A. Eskedahl.** There were two indictments of each defendant as above stated.

Commonwealth *v.* LePage.

In view of the judge's appropriate instructions to the jury at the trial
of indictments, there was no error in his refusal to strike the prosecu-
tor's opening statement containing references to matters discussed in
motions by the defendants to suppress which had been denied without
prejudice in advance of trial.   [409]

Upon a motion by the defendant in a criminal case to suppress evidence
on the ground that it resulted from an illegal arrest without a warrant,
the burden was on him to show that the arresting officer did not possess
sufficient information to constitute probable cause.   [411]

Evidence at the trial of indictments for murder against two defendants,
who fitted the victim's description of his assailants and were known by
police to have contacts with each other, warranted conclusions that on
an afternoon two days after the murder the police had probable cause
to arrest the defendants without warrants at the house of one of them,
to which a trail led from the scene of the crime, and that the arrests
were legal.   [410–411]

A finding by the trial judge in a murder case that confessions by the two
defendants at a police station late one night several days after the
murder were voluntary was warranted by evidence that the defendants
·had been repeatedly advised of their constitutional rights by police and
told that they could get in touch with counsel but that they never asked
for counsel, that they had been allowed to communicate with friends and
family and with each other, that one defendant had had an interview
with an attorney, who had advised him to take a polygraph test and
had left the police station while interrogation of the defendants was still
in progress, that thereafter another attorney had arrived at the police
station and, without asking to talk with the defendants, had been pres-
ent in the main room there while the defendants were being interrogated
in an adjoining room, and that neither attorney had requested that
interrogation of the defendants cease.   [416, 417]

Under *Johnson* v. *New Jersey,* 384 U. S. 719, State courts are permitted
a reasonable range of discretion in sensible appraisal of police action
taken with respect to alleged criminals prior to the decision in *Escobedo*
v. *Illinois,* 378 U. S. 478.   [416]

At the trial of indictments against two defendants for the murder by
shooting of a householder immediately after he had let them into his
house late at night through a ruse on their part, there was no error in
the admission of evidence of a conversation between the defendants and
the victim when he let them in, of physicians' testimony that the victim's
injuries were caused by a high velocity object and were consistent with
the passage of a bullet which had been received in evidence, of an asser-
tion by the victim's wife just after the shooting that "My husband's
been shot," of photographs of the defendants taken after their lawful
arrest, of a noninflammatory picture of the victim, of the movements of
one of the defendants shortly after the shooting, of an oral statement
made by one defendant in the other defendant's absence where the evi-
dence thereof was limited to the speaker alone, of a description of foot-
prints in the snow as "fresh," and of the trailing of the defendants by
trained dogs soon after the murder.   [417–418]

After the judge at a murder trial had held a voir dire, had found confessions by the defendants to have been made voluntarily, and had admitted them in evidence, he properly instructed the jury to disregard the confessions if they, the jury, found them "to have been involuntary and coerced by threats, promises or otherwise." [419]

At the trial of indictments for murder, where the uncontroverted evidence permitted the inference only that the defendants were committing an armed assault on a householder with intent to rob when, after they had gained admission to his house by a ruse, he in a scuffle with them was mortally wounded by the discharge of a loaded and cocked gun carried by them, the judge properly refused to include the issue of manslaughter in his charge even if the defendants were drunk when they came to the house. [419–420]

Four indictments found and returned on April 13, 1964.

The cases were tried in the Superior Court before *Bolster, J.*

*John P. Forte (Frank J. Opie* with him) for the defendant LePage.

*Robert U. Holden (Arthur J. Travers* with him) for the defendant Eskedahl.

*Richard S. Kelley,* Assistant District Attorney (*Ruth I. Abrams,* Assistant District Attorney, with him) for the Commonwealth.

Cutter, J.  LePage and Eskedahl were each found guilty of the murder, in the first degree, of Dr. Dalton C. O'Brien and of armed assault with intent to rob him.  There was a recommendation that sentence of death be not imposed.  Each defendant appealed.  On the evidence the following facts could be found.

About midnight of the night of March 10 to 11, 1964, Dr. and Mrs. O'Brien were in their house near Fresh Pond, Cambridge.  The lights were out.  The front door was secured.  About 12:15 a.m. there was a loud knocking at the front door.  Dr. O'Brien went downstairs.  Mrs. O'Brien heard him say, "Who is it?"  A voice replied, "There is somebody hurt.  There has been a bad accident.  Aren't you a doctor?"

Mrs. O'Brien then heard "a click and the noise of the chain."  She went from her bedroom to the upstairs hallway "and called her husband's name."  He replied, "Jus-

tina, don't come down. They have a gun." Mrs. O'Brien went to the bedroom telephone and tried to dial but received no answer. She heard "shuffling" downstairs, opened a window on the street side of the house, and shouted. She then heard a voice or two voices downstairs "with obscenities" and smelled "fumes or smoke." She saw her husband standing near "the top of the stairs with a bullet hole in his abdomen." He entered the bedroom, and said, "Don't go out there. They are still downstairs."

Mrs. O'Brien succeeded in reaching the police by telephone. The police, a fire department rescue unit, and a priest arrived. Mrs. O'Brien admitted them. About this time, she picked up a bullet on the stairs.[2]

Dr. O'Brien was taken to a hospital. Mrs. O'Brien never saw him again alive. The cause of death was the gunshot wound.

One Hayes, a Cambridge police officer, arrived at the O'Brien house about 12:30 A.M. on March 11. He observed "fresh" footprints in the snow leading in the direction of Huron Avenue. He searched the Fresh Pond area alone for a time. He was joined by another officer named Leonard, who had followed the footprints to the area near High Street and Park Avenue, at first by himself and later with Officer Vaughan of Watertown and a police dog. For a time, about 1:10 to 1:30 A.M. Officers Hayes and Leonard followed a man walking in an area about 600 to 1,500 feet from 28 High Street mentioned below. It was LePage. He said he had come "from Paddy's Bar on Walden Street," where he had been drinking with one Johnson.

That night Officer Hayes and Officer Vaughan with a trained police dog followed the trail from the O'Brien house twice to the vicinity of 28 High Street, about 1,000 feet in a straight line from the O'Brien house. The dog stopped at that house and searched around it.

---

[2] Mrs. O'Brien, with no other person present, asked her "husband what they wanted, and . . . if he knew . . . them, and he said no, there were two in their early twenties, and he didn't know them." He also said they wanted "dope."

On March 13, a Lieutenant Keefe of the Watertown po-
lice went to LePage's house in Watertown with Captain
Grainger and Sergeant Davenport (attached to the detec-
tive bureau) of the Cambridge police. They talked with
LePage. He told them that he had bought a Winchester
.30–30 rifle from a Cambridge pawn shop and had sold it to
a friend, Eskedahl. He also repeated his story that on the
night of March 10 he had been drinking at Paddy's Bar on
Walden Street with Johnson.[3]

On the same afternoon, Sergeant Davenport went to 28
High Street. He was admitted by Eskedahl's younger
brother. LePage arrived at the house at the same time and
in effect was directed to go into the house. Sergeant Dav-
enport, who identified himself as a police officer, then placed
Eskedahl and LePage in different rooms and questioned
them separately. Eskedahl (who could have been found to
have been drinking or drunk) admitted that he owned a
"Winchester .30–30" rifle which he had purchased from
LePage. He said that it had been stolen and that he had
not purchased cartridges for it. LePage told Sergeant
Davenport that Eskedahl had not told him that the rifle had
been stolen. The defendants, during the afternoon, plainly
were trying to talk themselves free of police suspicion.
They are not shown to have objected to any police action.

About 4:50 P.M. Sergeant Davenport formally placed both
defendants under arrest. LePage was put into a parked
police cruiser car until about 6:50 P.M. Sergeant Daven-
port obtained a warrant and searched 28 High Street until
shortly before 7 P.M., when Eskedahl was taken out of the
house. The defendants arrived at the police station about
7:15 P.M. and were questioned separately, apparently on an
intermittent basis, for several hours. They made oral
statements which contained highly incriminating admis-
sions, and, soon afterwards, other statements which

---

[3] Johnson testified that he had not seen LePage for "a good year" before
seeing him at the police station after his arrest; that LePage had told him
(Johnson) that the police had stopped LePage and searched him for narcotics
and had asked Johnson to say that, on the evening of March 10, they had been
together at Paddy's; and that in fact they had not been together.

amounted to confessions. The defendants' confessions constituted evidence of the facts stated in the following paragraph.

On the night of March 10–11, they had been drinking at Eskedahl's house at 28 High Street. They were "broke" and "went down to the Fresh Pond area" because Eskedahl "said he knew where they could get $2,000." They knocked at Dr. O'Brien's door and told the doctor when he came to the door that there had been "an accident." The doctor started to unlock the door. One of them pushed against the door. The doctor was standing behind the door and was knocked over. There was a scuffle between Dr. O'Brien and LePage. Furniture was knocked over. LePage ran into Eskedahl who had the gun loaded and "cocked." The gun went off and the doctor was hit. LePage and Eskedahl fled along essentially the route later traced by the dog to 28 High Street. Later they saw dogs on High Street. They also admitted that they "got a cab . . . told the . . . driver we were on furlough. We had the rifle in a duffle bag." The driver who identified them at the trial took them to Mt. Auburn Street and University Road. They then walked to the footpath along the Charles River and "threw the gun in." It was later recovered. Both defendants participated in making the statements and in reënacting the scuffle for the police.

The principal question presented is whether the judge properly admitted in evidence the defendants' statements given to the police after their arrest. Further facts concerning the arrest, confinement, and interrogation of the defendants and concerning other aspects of the trial are stated in connection with the discussion below of the assignments of error to which they are relevant.

1. The defendants filed in advance of trial motions to suppress their oral admissions or confessions to the police and certain tangible property (including a Winchester rifle). *Commonwealth* v. *Lewis,* 346 Mass. 373, 382. See *Commonwealth* v. *Jacobs,* 346 Mass. 300, 304–305. The trial judge denied these motions without prejudice in ad-

vance of trial.   He heard the motions upon a voir dire during the trial and ruled that the admissions and confessions were voluntary.   He ruled upon the admissibility of tangible items as they severally were offered in evidence.

In some cases ruling upon such motions in advance of trial will facilitate the administration of justice.   That, however, may not always be so.   In this instance, examination of the transcript shows that the trial judge, in his discretion, reasonably decided that dealing with the motions during the trial would adequately protect the rights of the defendants and consume less court time than attempting to decide them in advance of trial.

The defendants rely upon Rule 41 (e) of the Federal Rules of Criminal Procedure, 18 U. S. C. Appendix, 3764 (1964), as requiring pre-trial disposition of such motions with respect to tangible property.   The Federal precedents, of course, may be helpful guidance in an area where *Mapp* v. *Ohio,* 367 U. S. 643, and other decisions of the Supreme Court of the United States have caused substantial revision of State criminal procedures or where there is no clearly established Massachusetts practice.   See *Commonwealth* v. *Monosson,* 351 Mass. 327, 329–330.   The Federal rules and cases, however, do not control Massachusetts procedures, so long as there is no violation of applicable Federal constitutional principles.   The defendants have shown no prejudice from the course followed by the trial judge.

In the opening for the Commonwealth, reference was made to some matters discussed in the defendants' motions to suppress evidence.   The defendants claimed exceptions to the trial judge's refusal to strike the references and the opening.   The judge appropriately instructed the jury, at once and later, that nothing said in the opening was evidence and that they were not to regard statements in the opening as more than a prediction of what the evidence would be.   There was no error.   *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 583.   See *Commonwealth* v. *Crehan,* 345 Mass. 609, 613.

2. A number of assignments present the question whether the defendants' incriminating statements, and the rifle discovered as a consequence of these statements, were illegally obtained and hence improperly admitted in evidence. The trial judge, in the absence of the jury, conducted a careful voir dire before admitting in evidence the defendants' statements to the police after their arrest or the rifle. See *Commonwealth* v. *Rogers,* 351 Mass. 522, 529–531; *Jackson* v. *Denno,* 378 U. S. 368, 378–391. Certain other items which were the subject of motions to suppress were not introduced in evidence.

In a manner consistent with the principle stated in the *Rogers* case the judge determined for himself as a question of law "[w]hether [the] evidence had been unlawfully obtained." He decided in effect that the defendants had not been deprived of constitutional rights. He also concluded that the statements were voluntary by a process, which, as we read *Jackson* v. *Denno* (at pp. 376–391, esp. p. 378, fn. 8; cf. separate opinion, pp. 403–408), has recently received the approval of the Supreme Court of the United States. Cf. *Sims* v. *Georgia,* 385 U. S. 538, 542–544. In any event, no pertinent exceptions were saved to the judge's charge (with respect to the jury's function in passing upon the defendants' statements).

The defendants now assert that they were detained and arrested without probable cause (see *Wong Sun* v. *United States,* 371 U. S. 471, 479) and interrogated in violation of their constitutional rights. We deal first with their interrogation and arrest at 28 High Street.

It is by no means clear that the defendants' argument (that their arrest was illegal and that all evidence resulting from it should have been excluded), even if raised specifically in the trial court, is presented by any assignment of error. See *Commonwealth* v. *Lewis,* 346 Mass. 373, 383; *Commonwealth* v. *Nunes,* 351 Mass. 401, 405–406; *Commonwealth* v. *McCambridge,* 351 Mass. 516, 521. If, however, the question is treated as raised by general assignments of error, the arrests cannot be said to have been without prob-

able cause. The evidence indicates that, at the time of the formal arrests, and perhaps at least as early as Sergeant Davenport's arrival at Eskedahl's house on March 13, the information possessed by the police could be found to have amounted to probable cause for belief that the defendants, who fitted Dr. O'Brien's description of them[4] and were known to have had contacts with each other, were involved in the homicide. See *Wong Sun* v. *United States,* 371 U. S. 471, 479. The burden was on the defendants to show that the arresting officer did not directly or by reliable hearsay (see *Draper* v. *United States,* 358 U. S. 307, 310–314) have sufficient information to constitute probable cause. See *Commonwealth* v. *Fancy,* 349 Mass. 196, 202–203; *Commonwealth* v. *Mitchell,* 350 Mass. 459, 464. We hold that the arrests were legal and that no illegality in them gave basis for the exclusion of statements later made to the police.

The defendants' principal contention is that their incriminating statements at the police station were obtained in violation of their constitutional rights. The circumstances in which these statements were made could have been found to have been as described below. Neither defendant testified concerning these events either at the voir dire or before the jury.

When LePage was taken from Eskedahl's house to wait in a parked police car, he was informed by Sergeant Davenport that he was under arrest and that anything he said would be used against him. Some two hours later, when Eskedahl was taken from the house, Sergeant Davenport in Eskedahl's presence told a Mrs. Delaney, Eskedahl's neighbor and an old family friend, that he was being charged with suspicion of murder; that he did not "have to tell us a

---

[4] Dr. O'Brien on his way to the hospital and at the hospital had given descriptions of his assailants and other information which were excluded after a voir dire on the ground that at the time the doctor was not in apprehension of impending death. We need not decide whether the rulings, in the circumstances, were unduly favorable to the defendants. See *Commonwealth* v. *Viera,* 329 Mass. 470, 472–473. The statements may be considered, in any event, in determining whether the police had probable cause. See *Draper* v. *United States,* 358 U. S. 307, 312–313. See also *McCray* v. *Illinois,* 386 U. S. 300, 304–305.

thing if he didn't wish to because we would use it"; that
"she could feel quite free to come to the . . . [p]olice
[s]tation"; and that she "could tell . . . [Eskedahl's] at-
torney." Upon their arrival at the police station, Sergeant
Davenport warned both defendants that "they didn't have
to tell us a word if they didn't wish to," and told them that
they could get in touch with friends, their family, or an
attorney. He also called their attention to a notice posted
on the wall concerning their rights. See G. L. c. 276, § 33A
(as amended through St. 1963, c. 212); *Commonwealth* v.
*Bouchard*, 347 Mass. 418, 420; *Commonwealth* v. *Kerrigan*,
349 Mass. 295, 299.

After the defendants had gone to the police station, Mrs.
Delaney called Eskedahl's lawyer, Mr. Andrew, who twice
before had represented Eskedahl in criminal matters. He
had over fifty years' experience as a lawyer, was then a
county commissioner, and had served as assistant district
attorney, assistant attorney general, and district attorney.
Mr. Andrew arrived at the police station at 8:15 P.M. and
spoke to Captain Grainger, the officer in charge, who said
that Eskedahl was at the police station, and "[i]f you wait
a little while, you can take him home with you." Mr. An-
drew was at once permitted to confer privately with Eske-
dahl for as long as he wished.

After interviewing his client, Mr. Andrew told Captain
Grainger and Sergeant Davenport that Eskedahl denied
any connection with the matter, that he had found Eskedahl
truthful on prior occasions, and that he believed him. Mr.
Andrew also said that he had advised Eskedahl to comply
with the police request that he take a polygraph test, which
later Eskedahl declined to do. Captain Grainger "told
Mr. Andrew that the defendants were merely suspect, that
at that time there was nothing tangible relating to the case,
that we would hold them, and if nothing developed, then we
would release them." Sergeant Davenport said to Captain
Grainger, in Mr. Andrew's presence, "I haven't made up
my mind as to what complaint, if any . . . to make against
. . . them." It was then agreed that Mr. Andrew would

telephone the police an hour later, at which time they per-
haps "could tell him definitely whether the men would be
released." Mr. Andrew never asked to see LePage be-
cause he did not think it necessary, nor did he tell the police
(although he did tell Eskedahl) that he would represent
LePage also. Mr. Andrew left the police station around
9:20 P.M.[5] Sometime after 10 P.M. Mr. Andrew talked by
telephone with the police and learned[6] that, "[b]ecause of
conflicting statements," they had "decided to hold" the de-
fendants for murder. Mr. Andrew called Mr. Travers (see
fn. 5) and asked him to go to the police station and advise
both defendants "as to their rights."

The interrogation continued. During the course of the
evening, the police offered the defendants food and coffee.
LePage admitted having lied and, sometime before 11 P.M.,
made several admissions. Sergeant Davenport told him
that he could make no promises with respect to sentencing
or to keeping his friend Johnson (fn. 3) out of the investi-
gation. LePage said that he would make a statement, but
only if Eskedahl agreed, and asked to speak with him alone.

Shortly after 11 P.M. the defendants conferred privately
for about fifteen minutes. About 11:30 P.M., while being
taken to a water bubbler in the hall, LePage spoke briefly
(out of hearing of the police officers) with his wife, who had
arrived at the station in the later part of the evening, and
who, before then, had spoken with him "two or three times"
by telephone. During the evening Eskedahl participated in
at least one telephone call. The defendants did not ask to
use the telephone. There is no evidence that either defend-
ant asked to see counsel.

Around midnight LePage told Sergeant Davenport that
he wanted to make a statement. Eskedahl asked the police
what evidence they had, and was told that they were trying

---

[5] Shortly after Mr. Andrew had left the police station in the early evening,
Mr. Travers, an attorney, arrived there looking for Mr. Andrew. He said
nothing about LePage or Eskedahl, and departed when informed that Mr.
Andrew had gone.

[6] Mr. Andrew testified that he spoke to Sergeant Davenport, but the latter
denied this.

to obtain a spent slug from the previous owner of the defendants' rifle for comparison with the fatal slug, but that LePage had not yet given them a statement. LePage said to Eskedahl, "They caught me in about . . . [fifty five] lies." The defendants asked to be left alone again, and they conferred. Eskedahl then said to the police officers, "Hypothetically, two guys with a gun . . . [it] goes off and is bumped. What could it be?" One of the detectives, Sergeant Norton, said, "Isn't that what I have said right along?" LePage said, "[Y]ou have the truth. This is it."

At this point, at some time before 1 A.M., Captain Grainger entered the interrogation room and advised the defendants of certain rights.[7] Both defendants said that they had been "told by the sergeants about . . . [their] rights," and that they would give a formal statement. Captain Grainger left the room to arrange for a stenographer to come from the State police. Then, shortly before 1:30 A.M., Captain Grainger told the defendants' attorney, Mr. Travers (fn. 5), who was then at the police station, that a stenographer was coming to take the defendants' statement. Mr. Travers conferred in private with both defendants. Captain Grainger's testimony indicates that it was during a brief interval between the time that he left the interrogation room and the time when Mr. Travers consulted with the defendants, that they gave Sergeant Davenport and other police officers portions of the confession described above.

The defendants argue that Mr. Travers' presence and activities at the police station show that their confession was illegally obtained. On somewhat conflicting evidence, it could have been found that Mr. Travers arrived at the police station for the second time that night (see fn. 5) at 12:30 A.M.,[8] in response to Mr. Andrew's call, and informed

---

[7] He told them that they did not have to give a statement, that if they did it would be used against them, that any statement must be voluntary, and that the police could make them no promises.

[8] Mr. Travers testified that he arrived about an hour and a half earlier.

Sergeant Norton that he represented Eskedahl. He was
told that the police had ''both boys . . . in the back room,
just clearing up a few points, would he [Mr. Travers] mind
going out and getting some coffee.'' Mr. Travers returned
with the coffee about 1 A.M.,[9] and, without having further
conversation with Sergeant Norton, took a seat at one of
the desks in the main room next to the interrogation room.[10]
There was evidence that neither Mr. Travers nor anyone
else asked Sergeant Davenport (or asked Sergeant Norton
in Davenport's presence) for an opportunity to talk to the
defendants, and that Mr. Travers, seated at a desk in the
detectives' main room, merely said ''hello'' to Captain
Grainger as the latter came through the room about 1 A.M.
on his way to see the defendants.[11] Captain Grainger had
heard that Mr. Travers had been there ''some . . . time,''
and knew that Mr. Travers represented Eskedahl (though
not LePage). Neither Sergeant Norton nor Captain Grain-
ger informed the defendants of Mr. Travers' presence.
Mr. Travers conferred with the defendants for a half hour
or more, beginning about 1:30 A.M. Thereafter he stated
that he did not want either defendant questioned further
and that they would repudiate anything they had already
said.

There is no suggestion in the record of physical abuse or
threats. There was no evidence fairly presenting any is-
sue that the confessions were induced by deception. *United
States* v. *Valente,* 155 F. Supp. 577, 578–579 (D. Mass.), re-

---

[9] Mr. Travers testified that he returned about 11:30 P.M.

[10] According to Mr. Travers' testimony, which, of course, the judge and the
jury were not required to believe, he was not ''allowed'' at this time to see
the defendants, but he did not actually try to enter the interrogation room.
He said that he told Sergeant Norton at 11:30 P.M. that he ''thought it was
about time that I saw these boys,'' to which Sergeant Norton replied,
''[W]e've got something going and neither you nor anyone else is going to
interfere with it. . . . [B]e patient.'' He added, ''I'll let you know when
you can see them.'' Mr. Travers also testified that he got the same answer a
half hour later and that he had told Sergeant Norton that he ''was there to
represent both defendants.''

[11] Mr. Travers testified that he rose and tried to talk with Captain Grainger
about seeing the defendants, but that Captain Grainger ''rushed right by''
him.

lied upon by the defendants, rests largely on *Mallory* v. *United States,* 354 U. S. 449, and the Federal requirement of prompt production before a magistrate. The two youths were allowed to communicate with friends and family and with each other. Eskedahl was permitted to see Mr. Andrew who gave him advice. Mr. Andrew knew or should have known when he left the police station that the police had not completed examining the defendants and that questioning would continue. Such further interrogation was at least with his implied acquiescence in view of his advice that Eskedahl take a polygraph test. As indicated above, neither defendant requested an opportunity to consult counsel. The judge was warranted in finding that the confession was voluntary. Cf. *Haynes* v. *Washington,* 373 U. S. 503, 504, 507–515.

The interrogation of the defendants occurred before the decision in *Escobedo* v. *Illinois,* 378 U. S. 478 (June 22, 1964). The trial (February 4 to 19, 1965) took place before the decision in *Miranda* v. *Arizona,* 384 U. S. 436 (June 13, 1966). The *Miranda* decision, of course, need not be retroactively applied to this case. *Johnson* v. *New Jersey,* 384 U. S. 719, 726–735. See *Commonwealth* v. *Morrissey,* 351 Mass. 505, 509–511. See also *Commonwealth* v. *McCambridge,* 351 Mass. 516, 520–521, and cases there cited. The Supreme Court in the *Johnson* case, 384 U. S. 719, 731–735, recognized that police authorities, like the Cambridge police in the present case, "attempting to protect the privilege" against self-incrimination, prior to the *Escobedo* and *Miranda* decisions, had "not been apprised . . . of the specific safeguards" which emerged in those cases. That court also recognized that naturally enough, such police authorities may have "adopted devices which, although" not complying fully with those safeguards, "were not intentional evasions of the requirements of the privilege." We think that the *Johnson* decision permits the State courts a reasonable range of discretion in sensible appraisal of police action taken prior to and in ignorance of the *Escobedo* decision. See *Commonwealth* v. *Tracy,* 349 Mass. 87, 98–99,

cert. den. 384 U. S. 1022; *Commonwealth* v. *Chase,* 350 Mass. 738, 742–743; *Commonwealth* v. *Rogers,* 351 Mass. 522, 530– 531. That these defendants were repeatedly warned of their rights, that they were told that they could get in touch with counsel, that Eskedahl talked with counsel who gave advice at the police station, and that they never asked for counsel distinguishes this case from the *Escobedo* case, 378 U. S. 478, 490–491, and *Commonwealth* v. *Guerro,* 349 Mass. 277, 279, 281–282 (refusal of request to call lawyer). See *Commonwealth* v. *Sousa,* 350 Mass. 591, 598–599; *Commonwealth* v. *Kleciak,* 350 Mass. 679, 685–689.

There is no evidence that either Mr. Andrew, when and if he called the police by telephone, or Mr. Travers, prior to his talk with the defendants at the police station, requested or demanded of the police that they cease their interrogation of the defendants. Cf. *People* v. *Gunner,* 15 N. Y. 2d 226, 231–232, where a majority of the New York Court of Appeal (at pp. 232–233) refused to extend the doctrine of the *Escobedo* case, but held that a specific request by an attorney that there be no questioning of his client precluded the introduction of the client's statements made thereafter.

3. There is no merit to the defendants' exceptions to rulings concerning evidence.

(a) The conversation downstairs, when Dr. O'Brien admitted the intruders, was part of the events constituting the murder. It was admissible. See *Commonwealth* v. *Simpson,* 300 Mass. 45, 50–51, cert. den. 304 U. S. 565. We need not decide whether the judge was required to strike, as he did, Mrs. O'Brien's testimony (fn. 2) concerning her husband's later remarks to her upstairs.[12]

---

[12] See *Commonwealth* v. *Hampton,* 351 Mass. 447, 449–450; *Hetel* v. *Messier's Diner, Inc., ante,* 140, 141–142. See also *French* v. *French,* 14 Gray, 186, 188; *Commonwealth* v. *Jardine,* 143 Mass. 567; Wigmore, Evidence (McNaughton rev.) §§ 2332–2337, but cf. § 488. Cf. *Commonwealth* v. *Cronin,* 185 Mass. 96. Nor need we consider whether any public policy is clearly shown in G. L. c. 233, § 20, First, based on protection of a confidential marital relationship, which precludes the admission in evidence, after the death of one spouse, of private spontaneous statements by spouses during or immediately following an invasion of their home. See G. L. c. 233, § 65 (as amended through St. 1943, c. 232, § 1), which applies to civil proceedings.

(b) The trial judge within his discretion could permit Dr. Carter to testify that Dr. O'Brien's injuries, observed by him when treating Dr. O'Brien at the hospital, were caused by a high velocity object. He could also allow Dr. Luongo, a medical examiner, to express the opinion that the injuries were consistent with the passage of a bullet which had been received in evidence. See *Commonwealth* v. *Bellino,* 320 Mass. 635, 637–638; *Commonwealth* v. *Burke,* 344 Mass. 243, 248–249.

(c) Hayes, a policeman, testified that, when he arrived at the O'Brien house just after the shooting, Mrs. O'Brien said, "My husband's been shot." It was merely an assertion of an indisputable fact.

(d) The trial judge, in his discretion, could admit photographs of the defendants taken at the time of their arrest. The pictures of the defendants were not the result of illegal police action. See *Commonwealth* v. *Palladino,* 346 Mass. 720, 724. Since made after the arrest, they had no tendency to show guilt of any prior crime. Cf. *Commonwealth* v. *McLellan,* 351 Mass. 335, 336. A picture of Dr. O'Brien was not inflammatory. Although all these pictures were of limited relevance, they were not prejudicial. See *Commonwealth* v. *Valcourt,* 333 Mass. 706, 711–712; *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279. See also *Commonwealth* v. *Smith,* 350 Mass. 600, 607; *Commonwealth* v. *Stirling,* 351 Mass. 68, 71–72.

(e) The trial judge admitted against both defendants evidence of the movements of LePage observed by two officers in the early morning of March 11. He carefully limited to LePage alone the evidence of LePage's oral statements made in Eskedahl's absence. LePage and Eskedahl later were sufficiently linked with each other so that where they respectively were at various times on the night of the murder was of significance as to each of them.

(f) There was no error in permitting a police officer to describe footprints in the snow as "fresh." *Commonwealth* v. *Cataldo,* 326 Mass. 373, 376.

(g) There was no error in admitting the evidence of the trailing of the intruders by trained dogs. See *Common-*

*wealth* v. *Smith,* 342 Mass. 180, 182 (bloodhounds search without result). Decisions in other States frequently have treated such evidence as admissible at least as corroborative of other testimony. See Wigmore, Evidence (3d ed.) § 177. The capacity of trained dogs to follow a human's trail has long been known. Cf. *Commonwealth* v. *Fatalo,* 346 Mass. 266 (discussing the lack of general acceptance of polygraph testimony). Although such evidence should be limited to matters as to which it is likely to be reliable, it may be admitted in the exercise of a sound judicial discretion.

4. The exceptions to the charge are without merit. Viewed as a whole and in detail, it was thorough, clear, and informative. Two matters only are worthy of comment.

(a) There was no error in the judge's explanation of the jury's function in determining whether the confessions were voluntary. He told the jury to disregard the confessions if they found the "confessions to have been involuntary and coerced by threats, promises, or otherwise."

(b) In a homicide case, the trial judge should charge on the issue of manslaughter where any view of the evidence will permit a finding that the offence is manslaughter and not murder. See e.g. *Commonwealth* v. *Campbell, ante,* 387, 391–392. There was, however, no occasion here for the judge so to charge, for there was no evidence upon which the jury could find that the defendants were not engaged in the commission of a felony when the killing occurred. Although Dr. O'Brien was induced to unlock the door by the ruse of stating that there had been an accident, the uncontroverted evidence that the defendants were the armed intruders, that their purpose was to take money, and that they began the scuffle with Dr. O'Brien, permitted the inference only that the invaders were committing an armed assault with intent to rob in a dwelling house. Also, if the jury were to find from the evidence of drinking that the defendants came to the O'Brien house drunk, their acts would still not lack the guilty intent necessary for there to have been a felonious assault. See *Commonwealth* v. *Farrell,*

322 Mass. 606, 621. See also *Commonwealth* v. *Hawkins*, 3 Gray, 463, 466; *Commonwealth* v. *Rogers*, 351 Mass. 522, 532–533. A homicide during the commission of a felony is murder. *Commonwealth* v. *Devereaux*, 256 Mass. 387, 393–395. *Commonwealth* v. *Green*, 302 Mass. 547, 554–556. See *Commonwealth* v. *Lussier*, 333 Mass. 83, 89–93. See also *Commonwealth* v. *Venuti*, 315 Mass. 255, 258; *Commonwealth* v. *Gricus*, 317 Mass. 403, 411–412; *Commonwealth* v. *Devlin*, 335 Mass. 555, 566–568; *Commonwealth* v. *Ladetto*, 349 Mass. 237, 248–249. It was a natural and probable result of carrying out the criminal purpose that the loaded and cocked gun was discharged.

5. Other assignments need not be discussed.

6. We perceive no reason in justice for disturbing the judgments. See G. L. c. 278, § 33E (as amended through St. 1962, c. 453).

*Judgments affirmed.*