## Commonwealth *vs.* Floyd A. Hill, Jr.

No. 99-P-1645.

Berkshire. June 4, 2001. - July 26, 2001.

Present: Duffly, Cypher, & Mason, JJ.

*Practice, Criminal,* Probation, Revocation of probation. *Due Process of Law,* Probation revocation. *Evidence,* Hearsay. *Identification.*

At a hearing on a motion to revoke the defendant's probation and commit him to a house of correction on the ground that he violated his probation by breaking into a home and committing a rape, the judge properly admitted the victim's grand jury testimony where, although hearsay, the testimony was sufficiently reliable to be admissible; in addition, certain dog-tracking evidence was admissible, upon a proper foundation having been laid, due to its widely recognized reliability. [152-154]

At a probation revocation hearing, the judge's entry of an order revoking the defendant's probation and committing him to a house of correction on the ground that he violated his probation by breaking into a home and committing a rape was not unreasonable or unwarranted by the evidence in the record before him when considered under the standard of a preponderance of the evidence. [154-155]

Indictments found and returned in the Superior Court Department on May 19, 1995.

A proceeding for revocation of probation was heard by *Daniel A. Ford,* J.

*Catherine K. Byrne* for the defendant.

*Joseph A. Pieropan,* Assistant District Attorney, for the Commonwealth.

Mason, J. Floyd Hill appeals from an order revoking his probation and committing him to a house of correction on the ground that he violated his probation by breaking into a home in West Stockbridge and raping a sixteen year old victim, Jane.[1] Hill contends that the revocation order was entered in violation

---

[1] A pseudonym.

of his due process right to confront the witnesses against him and was based on insufficient evidence. We affirm the order.

*Background.* In March, 1996, Hill pleaded guilty in Superior Court to indictments charging rape, assault with intent to commit rape, and assault with a dangerous weapon. Hill was sentenced to five to seven years' incarceration on the first two charges, and to two and one-half years' incarceration on the third charge, with all the sentences to run concurrently. The court, however, suspended each of the sentences and placed Hill on probation until March, 1998. Hill signed a form that listed the terms of his probation, including the condition that he obey local, State, and Federal laws and court orders.[2]

In December, 1997, while Hill was still on probation, he was indicted for aggravated rape, assault with a dangerous weapon, and breaking and entering in the daytime with intent to commit a felony, placing a person in fear. Each of these indictments charged that on Friday, November 7, 1997, Hill had broken into Jane's home and had raped her at knifepoint. Shortly thereafter, Hill was given a "Notice of Surrender and Hearing(s) for Alleged Violation(s) of Probation." The notice referred to the indictments.

*The facts.* The Commonwealth's evidence at the revocation hearing showed the following facts. Jane was born in 1981, and resided with her parents in West Stockbridge. On the morning of Friday, November 7, 1996, Jane was at home recovering from an illness. She awoke at about 9:52 A.M. and went downstairs to the kitchen to make herself breakfast. Shortly after Jane entered the kitchen, an intruder, whom Jane described as being about six feet tall, wearing a grey long-sleeved shirt and dark brown work gloves, and sounding as though he was forty to fifty years old, grabbed her from behind with one hand and held a knife in front of her with the other. The intruder told Jane in a deep, gruff voice that he would kill her if she did not do what he wanted.

The intruder placed a soft blue bag over Jane's head, and then forced her to walk into the living room, lie down on her back on a rug on the floor, and remove the shorts she was

---

[2]In April, 1996, the sentences on the first two charges, i.e., rape and assault with intent to commit rape, were revised to two years of straight probation.

wearing. He then proceeded to rape her for about five or ten minutes. Immediately before the intruder began the rape, Jane asked him to wear a condom "if he was going to do this," and the intruder responded, "all right," but Jane could not determine whether he had complied.

After he was finished, the intruder told Jane to roll over on her stomach and count to one hundred before opening her eyes or lifting her head. He then removed the bag from Jane's head and fled through the kitchen and out the back door of the house. After the intruder had left, Jane looked up and saw that the clock on the video recording device in her living room showed 10:34 A.M. She also noticed that the knife used by the intruder lay on the floor next to her. After getting up and ensuring that the doors and windows of the house were locked, Jane called her mother and reported that she had been attacked.

Jane's father was the first to arrive at the house in response to Jane's call and, after speaking briefly to Jane, he called the police. About two minutes later, Chief Michael Kirchner of the West Stockbridge police department, and then Chief Wilcox of the Stockbridge police department, arrived at the home. Chief Kirchner promptly requested additional assistance from the State police, including a helicopter and a canine unit. In the meantime, Jane was taken by her mother to Fairview Hospital in Great Barrington.

Thereafter, Chief Kirchner and several State police officers conducted a search of the area by foot, car, and helicopter. They also interviewed numerous persons in the area, including persons who were working on railroad tracks running behind the victim's residence, and those working on the roof of a house across the tracks, as well as several neighbors living in nearby homes. No one reported having observed any suspicious persons in the area. Nor could the police officers find a blue bag or other item that might have been used in the attack.

At about noon, however, Sergeant Neal Raymond of the State police canine unit arrived at the victim's home with his tracking dog. After picking up a scent at the rear door to the house, the dog followed the scent out to a local roadway, Route 102, and then up to Hill's house, which was only about 575 feet away from the victim's house. The dog paused only briefly to obtain

a drink of water at a stream and then, upon arriving at Hill's house, went initially to the front door, then to a mailbox in front of the house, and then back to the front door. When the dog reached the front door the second time, the dog indicated that the scent trail had ended.

Sergeant Raymond caused a search of the indicated scent track to be conducted by a separate canine evidence recovery team, but nothing was found. Raymond then reported back to Chief Kirchner who, together with another State police officer, went to Hill's home and spoke to him. Hill said that he was alone in the house and had been sleeping on the floor in his living room until about 10:30 A.M., when he awoke and watched the second half of a television program. Hill further stated that, at about 11:15 A.M., he had gone outside to check his mailbox, but had immediately returned and not left his house again. Kirchner asked Hill if he and the other officer could look around and, when Hill responded affirmatively, they did so, looking for a blue bag or a shirt of the type the victim had described. Although they were not able to find any such item, they did collect several pieces of clothing, as well as various other items.

Kirchner then requested that Hill accompany him and the other police officer to the police station for a further interview, and Hill agreed to do so. During the interview, Kirchner stated to Hill that he would be asking him for a voice sample. Hill became visibly agitated and stated that he was "one hundred percent sure" that the police would not find any fingerprints or physical evidence at the victim's home, but that he was worried about the "voice thing." He also stated the following at the end of the interview: "We got the dog coming to my house. We got no fingerprints. You got no physical evidence. But I'm worried about the voice thing that we're going to do."

The next day, Saturday, November 8, West Stockbridge police officer Karl Cooper took Hill to the police station to provide the voice sample that Kirchner had requested. Hill repeated to Cooper his concern about the procedure but agreed to comply. Hill subsequently stated to Cooper that the person who had gone into the victim's home the previous day had "come in through the rear." Hill also stated that the intruder had "grabbed the [victim] from behind and held their hand over her mouth."

After securing Hill's voice sample, the police collected five other samples from different middle-aged men. Kirchner played each of these samples for Jane on the evening of Monday, November 10. Jane told Chief Kirchner at that time that Hill's voice was "very, very close to the voice of the person who attacked me."

Three days later, on Thursday, November 13, Kirchner learned from probation officer Michael Koperniak that Koperniak had called Hill's house on the morning of November 7 at about 10:15 A.M., but had not received any answer and had left a message for Hill on his answering service. Kirchner asked Cooper to investigate the matter and the next day, Friday, November 14, Cooper and another police officer went back to Hill's house and spoke to Hill about the matter. Hill told Cooper at that time that he had two telephones, one in the downstairs dining room and one upstairs, that both of the telephones worked, and that he had not received any telephone calls on the morning of November 7. Subsequently, however, Kirchner himself went to Hill's house and, after receiving Hill's permission, recorded each of the telephone messages that were still retained on Hill's answering service. The messages included one from Koperniak, and indicated that it had been received at 10:16 A.M. on November 7.

On Wednesday, November 19, Kirchner returned to Hill's house with several other police officers and, after receiving Hill's permission, conducted a further search of the house. Once again, however, the officers did not find a blue bag or any other item that might have been used in the attack. Nor did they ever find any fingerprint or other physical evidence linking Hill to the attack.

*The revocation hearing.* Raymond, Kirchner and Cooper all appeared as witnesses for the Commonwealth and testified to each of the events described above. Raymond also testified that he was qualified both by training and experience to use the tracking dog, and that the dog was adequately trained and able to track humans, including leaving and picking up a scent. Raymond further testified that he had instructed the officers arriving at the victim's house immediately after the incident occurred to restrict access to the rear door of the house to preclude

contamination of the intruder's track, and that he had placed his dog on the track in accordance with standard procedures shortly after he had arrived at the house. Raymond also testified that, a week after the incident in question, he verified his dog's performance by creating a separate scent-tracking exercise and observing that the dog was able to perform the exercise satisfactorily.

In addition to the live testimony of the officers, the victim's grand jury testimony, which consisted largely of a verbatim reading of a statement she had given to the police on the date of the incident, was introduced as an exhibit at the revocation hearing. Also, by agreement of the parties, the victim's testimony at a suppression hearing held the day before the revocation hearing was incorporated in the revocation hearing.[3] The suppression hearing had been held in response to a motion by Hill to suppress the victim's voice identification.

1. *Alleged due process violation.* Principally citing *Commonwealth* v. *Durling*, 407 Mass. 108 (1990), Hill contends that the revocation order must be set aside because it was based at least in part on hearsay and other incompetent evidence in violation of Hill's right, under the due process clause of the Fourteenth Amendment to the United States Constitution, to confront the witnesses against him. Hill refers specifically to the judge's admission of the victim's grand jury testimony and also to the dog-tracking evidence.

The Supreme Judicial Court held in *Durling* that probation revocation hearings were subject to the due process clause because they could result in a deprivation of liberty within the meaning of that clause. 407 Mass. at 112. The court went on to note, however, that, because "[r]evocation hearings are not part of a criminal prosecution," a "probationer need not be provided with the full panoply of constitutional protections applicable at a criminal trial." *Id.* The court then held that, upon weighing the competing interests, including that of the Commonwealth in using all reliable evidence in revocation hearings, hearsay was admissible in such proceedings so long as it was reliable and

---

[3]The suppression hearing was held before the same judge who presided at the revocation hearing.

the Commonwealth had good cause for not using a witness with personal knowledge. *Id.* at 112-120.

Although the court emphasized in *Durling* that "resolution of the confrontation issue depends on the totality of the circumstances in each case," *id.* at 118, it noted that "there are often valid reasons for not presenting live witnesses." *Id.* at 117. The court referred specifically to the circumstances presented by a rape case where the "only witness with personal knowledge of the crime is the victim," and "[t]he trauma of testifying at probable cause hearings, before the grand jury, and at trial is onerous enough for such a victim." *Id.* at 117 n.4. The court noted that "[s]ociety has an interest in not adding probation revocation hearings to that list." *Ibid.*

Particularly in light of these pronouncements in *Durling*, we think the judge properly admitted the victim's grand jury testimony in this case. The Commonwealth plainly had good cause for not calling the victim herself as a witness in light of her relatively young age and the potential trauma of describing still again what had happened to her. Moreover, the victim's grand jury testimony was given under oath and was factually detailed rather than general or conclusory. See *id.* at 121. It was also corroborated by the "fresh complaint" the victim made to the police at the time the incident occurred. See *Commonwealth v. Licata*, 412 Mass. 654, 656-657 (1992). The testimony, therefore, although hearsay, was sufficiently reliable to be admissible. See *Commonwealth v. Durling*, 407 Mass. at 120-121. Contrast *Commonwealth v. Podoprigora*, 48 Mass. App. Ct. 136, 138-139 (1999) (hearsay statement of twelve year old child that father had telephoned home in violation of restraining order did not bear sufficient indicia of reliability and was not sufficiently corroborated to serve as basis for revocation of defendant's probation).

There was also no due process violation in the judge's admission of the dog-tracking evidence. While obviously, as Hill complains, he had no opportunity to cross-examine the tracking dog, it is well established in this Commonwealth and elsewhere that such evidence is admissible, provided a proper foundation has been laid, due to its widely recognized reliability. See *Commonwealth v. LePage*, 352 Mass. 403, 418-419 (1967); *Com-*

*monwealth* v. *Taylor*, 426 Mass. 189, 197-198 (1997); Wigmore, Evidence § 177 (4th ed. 1983 & Supp. 1991).

2. *Sufficiency of identification evidence.* The standard of proof in a probation revocation proceeding is the civil standard of preponderance of the evidence rather than the criminal standard of beyond a reasonable doubt. See *Commonwealth* v. *Holmgren*, 421 Mass. 224, 227 (1995). A proposition is proved by a preponderance of the evidence "if it is made to appear more likely or probable in the sense that actual belief in its truth, derived from the evidence, exists in the mind or minds of the tribunal notwithstanding any doubts that may still linger there." See *Sargent* v. *Massachusetts Accident Co.*, 307 Mass. 246, 250 (1940).

We think that the Commonwealth met the applicable standard of proof. As summarized above, and as the judge specifically noted, in addition to the dog-tracking evidence, there was evidence that (1) contrary to Hill's assertions, Hill was not in his home at the time the rape was occurring; (2) Hill had knowledge of the details of the rape that he could not have had if he had not been present at the rape scene; and (3) the victim identified Hill's voice as being "very, very close" to the voice of the intruder and further stated at the suppression hearing that the only reason she had not made an even more positive identification was because she had in mind the "gravity of the situation." Although no one of these items may have been sufficient standing alone, and although Hill presented some rebuttal evidence,[4] we think all the items together warranted the judge's conclusion. See *Commonwealth* v. *Morse*, 50 Mass. App. Ct. 582, 594 (2000) (question on review of probation revocation decision is "whether the record discloses sufficient reliable evidence to warrant the findings by the judge").

---

[4]In an apparent effort to show that Hill might have gained knowledge of the details of the rape from an independent third party, Hill called as a witness a nurse employed at Fairview Hospital who testified that a doctor and possibly some other persons were present when the victim arrived at the hospital shortly after the incident occurred, and described what had happened. Hill also called as a witness a dog training expert who testified that it had been a "mistake" for the tracking dog to stop for a drink of water while pursuing the trail in this case, due to the possibility of confusion and picking up another track.

Hill's reliance on *Commonwealth* v. *Mazza*, 399 Mass. 395 (1987), and the other cases cited in his brief, is misplaced. First, none of those cases involved a probation revocation hearing and its lower burden of proof. More important, in none of those cases was the evidence nearly as strong as the evidence presented in this case. For example, in *Commonwealth* v. *Mazza*, there was evidence that the defendant had a motive and possible opportunity to kill the victim but no evidence that he did kill the victim. 399 Mass. at 399-400. In *United States* v. *Luck*, 447 F.2d 1333, 1337 (6th Cir. 1971), there was testimony only that the defendant "resembled" the perpetrator of a bank robbery, but no other admissible evidence that he was the bank robber. We cannot say that, in the circumstances of this case, the judge's finding was unreasonable or unwarranted by the evidence in the record before him. See *Commonwealth* v. *Tate*, 34 Mass. App. Ct. 446, 450 (1993) ("The evidence did not compel the judge's findings [in a probation revocation proceeding], but it warranted them").

*Order revoking probation*
*affirmed.*